THE STATE OF WYOMING on the Relation of R. R.
  Crow & Co., a Corporation,

*Petitioner,*

vs.

EVERETT T. COPENHAVER, as State Auditor of
  Wyoming,

*Respondent.*

(No. 2363; September 9th, 1947; 184 Pac. (2d) 594)

6

For the relator there was a brief by C. A. Lathrop of Cheyenne, Wyoming, A. R. McMicken, Rawlins, Wyoming and Eph U. Johnson of Rawlins, Wyoming, and oral argument by Mr. Lathrop and Mr. Johnson.

For the respondent there was a brief by Norman B. Gray, Attorney General, John S. Miller, Deputy Attorney General and Frank M. Gallivan, Ass't. Attorney General all of Cheyenne, Wyoming, and oral argument by Mr. Miller.

## OPINION

RINER, Chief Justice.

This is an application by the State of Wyoming on the relation of R. R. Crow & Co., hereinafter designated the "petitioner," for a writ of mandamus to be issued in the

exercise of this court's original jurisdiction first brought against John J. McIntyre as Auditor of said State. The petition was filed December 21, 1946. Since that date the term of office of Mr. McIntyre has expired and Mr. Everett T. Copenhaver was elected to hold the office in his stead. Copenhaver is now the duly qualified and acting official. He will be usually referred to subsequently as the "Auditor" or as the "respondent." The suit was instituted to obtain this writ to compel the Auditor to draw and issue to relator certain warrants to be drawn on the State Treasurer of the State of Wyoming in payment of several sums of money claimed to be due relator and evidenced by four itemized vouchers presented to said Auditor as hereinafter mentioned in the allegations of petitioner's pleading to be presently reviewed.

March 21, 1947, the respondent filed a general demurrer to the petition. Upon the legal issues thus raised, the cause has been briefed, the last brief, a supplement one on behalf of the petitioner, being filed July 2, 1947. Thereupon the case was advanced on this court's docket, set for hearing, and orally argued and submitted by the parties on July 21, 1947. The allegations of the petition are substantially these:

Paragraphs numbers 1, 2, and 3 of the pleading state that petitioner is a Wyoming corporation at all times engaged in Carbon County, Wyoming, in the Production and manufacture of lumber and its products; that R. R. Crow is the principal stockholder, president and general manager of petitioner; that petitioner's operations are some times known and described as R. R. Crow and Crow Lumber Company, these latter appellations being identical with that of the petitioner; and that the respondent, John J. McIntyre, is and has been since September 14, 1945, the duly appointed, qualified, and acting State Auditor of this State.

Paragraph 4 of the petition states that after the declaration of war between the United States and Germany and Japan, lumber was declared by the government to be an essential commodity in the prosecution of the war effort, and both its manufacture and products declared to be an "essential industry."

Paragraphs 5, 6, 7, and 8 allege that petitioner, due to scarcity of labor resulting from the war, could not employ sufficient man power to conduct its aforesaid operations, and by agreements between the United States and petitioner, the latter procured from the War Department Italian and German prisoners of war to work in its lumber camps and mills, and under such agreements paid the government for the services of these prisoners the same wages as skilled civilian employees would have been paid; that these prisoners were unskilled in the lumber industry and it was necessary to train them to perform the different tasks assigned them in petitioner's operations aforesaid; that to provide the training of workers in essential industries during the war, the United States Congress appropriated funds for a War Production Training Program to be administered by the United States Office of Education cooperating with various State Boards of Education, these funds being deposited with the state treasurers of the states participating, including Wyoming, and to be withdrawn upon the requests of the State Board of Education of each state participating in such program; that under this program, "instructors were employed by the State Board of Education of this State for the training of the prisoners of war herein mentioned, and the salaries of such instructors were paid by said State Board of Education from the federal funds so deposited with the State Treasurer as above set forth."

Paragraph 9 avers that in 1917 the United States Congress by the Smith-Hughes Act (§§ 11-28, Ch. 2,

Title 20, U. S. C. A.) provided a plan of cooperation between the federal government and the several states for promoting vocational education in agriculture, trades and industry, commerce and home economics, which Act, with its supplementary legislation, provides federal funds to be matched with state funds for training teachers, supervisors and directors, and for teaching vocational subjects as mentioned in said Act; that the Act aforesaid required the states desiring to participate to accept the Act's provisions and to appoint the State Treasurer of the State as the custodian of the funds allotted by said Act to such state; that the State of Wyoming in 1917 accepted the requirements of the Smith-Hughes Act by Chapter 99, Laws of Wyoming, 1917 (§ 99-135 Revised Statutes of Wyoming, 1931) and designated Wyoming's State Treasurer as the custodian of these funds so allotted to the State of Wyoming under this federal legislation; that after such acceptance of the said Act aforesaid, the Wyoming Legislature from time to time appropriated state funds to be matched with federal funds under the Smith-Hughes Act and supplementary legislation, and did so appropriate state funds in the year 1945; that the state money thus appropriated is designated in the 1945 General Appropriation Act as "Vocational Education Contingent, 1945," and the money received by the State of Wyoming from the government under the Smith-Hughes Act aforesaid, and its supplementary legislation, is designated as the "Cooperative Vocational Educational Fund"; that the Wyoming State Treasurer is the custodian of the two funds above described, subject to withdrawal on warrants on the State Treasurer drawn and issued by the State Auditor upon claims or vouchers presented to the State Auditor by the State Board of Education or upon claims approved by said board.

The allegations of Paragraph 10 of said petition are verbatim as follows:

"That during the regular meeting of the State Board of Education held in Cheyenne, Wyoming, on April 9 and 10, 1945, the training of prisoners of war for the petitioner was discussed, and the following action was taken thereon by said Board as appears from the minutes of such meeting.

"'The training of prisoners of war *for the Crow Lumber Company* was explained and discussed. *If* this type of training *is needed after the close of War Production Training* it was decided to continue the training under the regular Trade and Industrial Education program. *As to whether or not training was to be continued was left to the decision of the State Director of Vocational Education.*'" (Italics supplied)

It is alleged in Paragraph 11 that "the War Production Training Program" aforesaid "was terminated on June 30, 1945," and the language of the remainder of this paragraph is—"but the training of the prisoners of war furnished the petitioner by the War Department under the agreements herein mentioned was continued through instruction received from instructors employed by the State Board of Education, with the approval of the United States Department of Education, under the provisions of the Smith-Hughes Act, and the supplementary legislation thereto, and it was agreed by and between the State Board of Education and petitioner that petitioner would pay the salaries to such instructors and that the State Board of Education would reimburse the petitioner therefor from funds under the jurisdiction and control of said Board."

Paragraph 12 states that during the month of August, 1945 (nothing being alleged concerning the preceding month of July), some 21 men, whose names are given, having been first employed by the State Board of Education as aforesaid, instructed prisoners of war in connection with the petitioner's operations, thereby earning

the sum of $2,903.50, which amount the petitioner paid these men as shown by copies of their receipts attached to the petition, Exhibits 1 to 4 inclusive and 6 to 22 inclusive, which are made part of the pleading; that on or about September 25, 1945, the petitioner, according to the agreement between it and the State Board of Education, described in Paragraph 11 supra, presented its two vouchers with the originals of Exhibits 1 to 4 inclusive and 6 to 22 inclusive to the State Board of Education for reimbursement, which vouchers were approved for payment by Esther L. Anderson, State Superintendent of Public Instruction and a member of the Board, and Sam Hitchcock, the Director of Vocational Education, and were endorsed for payment from the two funds herein described thus: $909.76 from the Vocational Education Contingent, 1945, aforesaid (state money) and $1,993.74 from the Cooperative Vocational Educational Fund (federal money); that copies of said vouchers with all endorsements appearing on the originals are attached to the petition and made a part thereof; that thereafter the State Board of Education presented to the Auditor the originals of these vouchers and receipts, and requested that he draw and issue to the petitioner warrants on the State Treasurer, one for $909.76 payable from the Vocational Education Contingent and one for $1,993.74 payable from the Cooperative Vocational Educational Fund.

Paragraph 13 is substantially the same in its allegations as the preceding paragraph, except it is stated that but 17 men, whose names are given, 16 of them having previously worked in August, 1945, as aforesaid, gave instruction to war prisoners during the month of September, 1945, and earned, through employment by the State Board of Education during that month, the sum of $2,327.50, which amount petitioner paid to said instructors as shown by the copies of their receipts attached,

Exhibits 24 to 40 inclusive, which are also made part of the pleading; that on or about December 12, 1945, petitioner, pursuant to the agreement between it and the State Board of Education as described in Paragraph 11 supra, presented its voucher with the originals of Exhibits 24 to 40 inclusive to the State Board of Education for reimbursement, this voucher being approved by the same persons as indicated in Paragraph 12 above in their respective capacities, being endorsed for payment in the amount of $2,327.50 from the Cooperative Vocational Educational Fund, and a copy thereof, with all endorsements on the original, is attached and made a part of the pleading; that said State Board of Education presented the original of this voucher with the originals of Exhibits 24 to 40 inclusive, attached, on December 13, 1945, to the Auditor and requested him to draw and issue to the petitioner a warrant on the State Treasurer of the State of Wyoming for the sum last mentioned payable from said Cooperative Vocational Educational Fund.

Similarly, Paragraph 14 states that during the month of October, 1945, 13 of the original 21 employees, whose names are listed, earned as instructors of prisoners of war on employment by the State Board of Education in petitioner's operations aforesaid, the sum of $1,230.00, which amount petitioner paid to said instructors as shown by their receipts attached, Exhibits 42 to 54 inclusive, which are likewise made part of the pleading; that on or about December 12, 1945, petitioner, pursuant to the agreement between it and the State Board of Education as described in Paragraph 11 supra, presented its voucher to said Board for reimbursement, approved as stated in the paragraph last preceding, being endorsed for payment in the amount of $1,230.00 from the Cooperative Vocational Educational Fund, and a copy thereof, with all endorsements on the original, is

attached and made part of the pleading; that on December 13, 1945, said State Board of Education presented to the Auditor the original of Exhibit 55 with all endorsements with the originals of Exhibits 42 to 54 inclusive attached, and requested that official to draw and issue a warrant on the State Treasurer of the State of Wyoming for the sum last mentioned, payable from said Cooperative Vocational Educational Fund.

It is stated in Paragraph 15 that the presentation by the State Board of Education of these four vouchers with attached receipts with the request that the Auditor issue warrants drawn on the State Treasurer payable from the aforesaid funds "constituted the accepted and usual practice of many years standing followed by the State Board of Education, the State Auditor, and the State Treasurer with regard to withdrawals from said funds."

The refusal of the Auditor to honor said four vouchers (Exhibits 5, 23, 41, and 55) and to draw and issue warrants to the petitioner on the State Treasurer aforesaid payable from the two funds (the Vocational Education Contingent and the Cooperative Vocational Educational Fund) for the various amounts set forth in said vouchers is averred in Paragraph 16 thereof, although it is stated there are moneys in each account in excess of $6,461.00, the total amount due petitioner on said vouchers.

Paragraphs 17 and 18 state that the Auditor's refusal to do these things is illegal and in violation of the duties imposed upon him by law and that petitioner has no speedy or adequate remedy at law to enforce the payments due it as aforesaid. Petitioner finally prays that a writ of mandamus be issued by this court requiring the said Auditor to perform the duties incumbent upon him and which he has declined to execute as aforesaid.

It may be noted that the word "petitioner" is used throughout this pleading when the relator only is apparently in fact intended.

As typical of the several copies of the receipts signed by the men employed as described in the foregoing review of petitioner's pleading, Exhibit 1 reads:

"Received from R. R. Crow & Co.
Address................................................................
..........Two Hundred Eight and no/100..........Dollars ($208) for services as instructor during month of August, 1945.

ALBERT BERG,

Exhibit No. 1                    By (s) Albert Berg."

Each of the four vouchers aforesaid, Exhibits 5, 23, 41, and 55 reads:

"STATE OF WYOMING, Dr.
         To: R. R. Crow,
                Crow Lumber Company,
                Saratoga, Wyoming."

Each voucher is verified by R. R. Crow on oath that:

"the above and foregoing account is just and correct and has not been paid, nor any part thereof, by the State of Wyoming."

On each voucher, after l i s t i n g the names of the employees and the amounts claimed to be due each man, is also a notation reading:

"(Tax to be withheld by Crow Lumber Company)"

On voucher Exhibit 5 appears the following:

"VOCATIONAL EDUCATION CONTINGENT, 1945
I certify that the above articles were delivered or services performed, as stated, and account is
APPROVED FOR PAYMENT FROM
(s) Esther L. Anderson
(s) Sam Hitchcock."

The other three vouchers (Exhibits 23, 41, and 55) are identical in containing the same language as that last quoted, except that instead of the words "Vocational

Education Contingent, 1945," appear the words "Cooperative Vocational Educational Fund."

The especially pertinent provisions of the Act of Congress of February 23, 1917 (39 Statutes at Large 929, Chapter 114), commonly known as the Smith-Hughes Act (Chapter 2 of Title 20 U. S. C. A.), referred to in petitioner's pleading, above reviewed, would appear to be:

Section 11 of Chapter 2 of Title 20 U. S. C. A. (Section 1of said Act):

"Section 11. There is annually appropriated, out of any money in the Treasury not otherwise appropriated, the amounts hereinafter provided for, to be paid to the respective States for the purpose of cooperating with the States in paying the salaries of teachers, supervisors, and directors of agricultural subjects, and teachers of trade, home economics, and industrial subjects, and in the preparation of teachers of agricultural, trade, industrial, and home economics subjects, and for the use of the Federal Board for Vocational Education for the administration of this chapter and for the purpose of making studies, investigations, and reports to aid in the organization and conduct of vocational education, which sums shall be expended as hereinafter provided. (Feb. 23, 1917, c. 114, § 1, 39 Stat. 929.)"

Section 12, 13, 14 (Sections 2, 3, and 4 of the Act) of said Chapter 2 provide for sundry annual appropriations of federal funds for vocational education under the Act.

Section 16 of Chapter 2, Title 20 U. S. C. A. (§ 5 of said Act) reads in part:

"Section 16. In order to secure the benefits of the appropriations provided for in Sections 12, 13, and 14 of this title, any State shall, through the legislative authority thereof, accept the provisions of this chapter and designate or create a State board, conssiting of not less than three members, and having all necessary power to cooperate, as herein provided, with the Federal Board for Vocational Education in the administration of the provisions of this chapter. The State Board of Educa-

tion, or other board having charge of the administration of public education in the State, or any State board having charge of the administration of any kind of vocational education in the State may, if the State so elect, be designated as the State board, for the purposes of this chapter."

Sections 19, 23 to 27 inclusive of said Chapter 2 (§§ 9, 13-18 inclusive of said Act) state respectively:

"Section 19. The appropriation for the salaries of teachers, supervisors, or directors of agricultural subjects and of teachers of trade, home economics, and industrial subjects shall be devoted exclusively to the payment of salaries of such teachers, supervisors, or directors having the minimum qualifications set up for the State by the State board, with the approval of the Federal Board for Vocational Education. The cost of instruction supplementary to the instruction in agricultural and in trade, home economics, and industrial subjects provided for in this chapter, necessary to build a well-rounded course of training, shall be borne by the State and local communities, and no part of the cost thereof shall be borne out of the appropriations made in this chapter. The moneys expended under the provisions of this chapter, in cooperation with the States, for the salaries of teachers, supervisors, or directors of agricultural subjects, or for the salaries of teachers of trade, home economics, and industrial subjects, shall be conditioned that for each dollar of Federal money expended for such salaries the State or local community, or both, shall expend an equal amount for such salaries; and that appropriations for the training of teachers of vocational subjects, as provided in this chapter, shall be conditioned that such money be expended for maintenance of such training and that for each dollar of Federal money so expended for maintenance, the State or local community, or both, shall expend an equal amount for the maintenance of such training. (Feb. 23, 1917, c. 114, § 9, 39 Stat. 933.)"

"Section 23. In order to secure the benefits of the appropriations for the salaries of teachers, supervisors, or directors of agricultural subjects, or for the salaries of teachers of trade, home economics, and industrial subjects, or for the training of teachers as provided in

this chapter, *any State shall, through the legislative authority thereof, appoint as custodian for said appropriations its State Treasurer, who shall receive and provide for the proper custody and disbursements of all money paid to the State from said appropriations.* (Feb. 23, 1917, c. 114, § 13, 39 Stat. 935)." (Italics supplied).

"Section 24. The Federal Board for Vocational Education shall annually ascertain whether the several States are using, or are prepared to use, the money received by them in accordance with the provisions of this chapter. On or before the first day of January of each year the Federal Board for Vocational Education shall certify to the Secretary of the Treasury each State which has accepted the provisions of this chapter and complied therewith, certifying the amounts which each State is entitled to receive under the provisions of this chapter. Upon such certification, the Secretary of the Treasury shall pay quarterly to the custodian for vocational education of each State the moneys to which it is entitled under the provisions of this chapter. The moneys so received by the custodian for vocational education for any State shall be paid out on the requisition of the State board as reimbursement for expenditures already incurred to such schools as are approved by said State board and are entitled to receive such moneys under the provisions of this chapter. (Feb. 23, 1917, c. 114, §14, 39 Stat. 935.)"

"Section 25. *Whenever any portion of the fund annually allotted to any State has not been expended for the purpose provided for in this chapter, a sum equal to such portion shall be deducted by the Federal board from the next succeeding annual allotment from such fund to such State.* (Feb. 23, 1917, c. 114, § 15, 39 Stat. 936)" (Italics supplied).

"Section 26. The Federal Board for Vocational Education may withhold the allotment of moneys to any State whenever it shall be determined that such moneys are not being expended for the purposes and under the conditions of this chapter.

"If any allotment is withheld from any State, the State board of such State may appeal to the Congress of the United States, and if the Congress shall not direct such

sum to be paid it shall be covered into the Treasury. (Feb. 23, 1917, c. 114, § 16, 39 Stat. 936.)"

"Section 27. If any portion of the moneys received by the custodian for vocational education of any State under this chapter, for any given purpose named in this chapter, shall, by any action or contingency, be diminished or lost, it shall be replaced by such State, and until so replaced no subsequent appropriation for such education shall be paid to such State. No portion of any moneys appropriated under this chapter for the benefit of the States shall be applied, directly or indirectly, to the purchase, erection, preservation, or repair of any building or buildings or equipment, or for the purchase or rental of lands, or *for the support of any religious or privately owned or conducted school or college.* (Feb. 23, 1917, c. 114, § 17, 39 Stat. 936)." (Italics supplied).

The Act of Congress, approved June 8, 1936, Chapter 541 of 49 Statutes at Large, 1488, 1490, appropriated additional vocational training funds from Federal money supplementing those provided for in the Smith-Hughes Act aforesaid, and in Section 6a of said Chapter, declared:

*"No part of the appropriations herein authorized shall be expended in industrial-plant training programs, except such industrial-plant training be bona-fide vocational training, and not a device to utilize the services of vocational trainees for private profit."* (Italics supplied).

The statute of this state (Laws 1917, Chapter 99, Wyoming Compiled Statutes, 1945, § 67-1201) accepting the provisions of the Smith-Hughes Act, contains this language:

"The State of Wyoming does hereby accept the provisions of an Act of the Congress of the United States of America, entitled 'An act to provide for the promotion of vocational education; to provide for cooperation with the States in the promotion of such education in agriculture and the trades and industries; to provide for cooperation with the States in the preparation of teachers of vocational subjects; and to appropriate money

and regulate its expenditure,' and will observe and comply with all the requirements of said Act.

"The State Board of Education is hereby designated as the State board for the purposes of the said Act and is hereby given all necessary power to cooperate with the Federal Board of Vocational Education in the administration of the provisions of the Act.

*"The State Treasurer is appointed custodian of funds allotted by Federal Act* to the State of Wyoming for the promotion of vocational education, and *he shall provide for the proper custody and disbursement of such funds on the requisition of the State Board of Education."* (Italics supplied).

The State Board of Education, referred to in the statute last above quoted, appears to have been established by Section 4 of Chapter 120, Laws of Wyoming, 1917, as amended by Laws of Wyoming, 1919, Chapter 127, Section 4, and the language of that section has been carried forward through subsequent compilations and revisions of our laws, and now is found in Section 67-104, Wyo. C. S. 1945. Its verbiage, in part, is:

"There shall be a State Board of Education to be composed of seven (7) members, at least two (2) of whom shall be persons actively engaged in educational work. The State Superintendent of Public Instruction shall be ex-officio a member of such board and shall have the right to vote. The other six (6) members of said board shall be appointed from among the citizens of the State in such a manner that the different parts of the State shall be represented, and not more than four (4) members of such Board shall be from one political party, and the members shall hold office from the first April succeeding their appointment for a term of six (6) years, provided that the length of the term of the first regular appointees under this section shall be as follows: Two (2) members shall be appointed for two (2) years, two (2) for four (4) years, two (2) for six (6) years, but thereafter the term of each member shall be six (6) years. They shall be appointed by the State Superintendent of Public Instruction with the approval of the Governor, and shall be appointed solely because of their character and fitness."

After setting out the qualifications of the members of the board, the method of filling vacancies thereon, indicating those who are eligible to reappointment, and how and for what causes members may be removed, the statute concludes thus:

"The board shall meet semi-annually on the second Monday in April and October. The first meeting of each year shall be for the purpose of organization, at which a chairman shall be elected, but the Commissioner of Education shall act as secretary. Special meetings may be held as often as the duties of the board require, and the board shall meet at the call of the State Superintendent of Public Instruction or the Governor whenever, in the opinion of these officials, an emergency exists."

Section 14 of Chapter 127 aforesaid declared that:

"The State Board of Education shall have general oversight of vocational or other special schools receiving State aid."

This language has also been carried forward as an operative statute of the State, and now appears as Section 67-113 ,Wyo. C. S., 1945.

The question presents itself at once—Did the legislature of Wyoming appropriate funds which the State Board of Education or any other competent authority could use for the purpose of paying the salaries of instructors employed to train prisoners of war as described in petitioner's pleading, above reviewed, so that they might become more proficient in performing the different tasks assigned them in relator's "various operations in the production of its different lumber products?" It must be conceded, and we think it is tacitly so, by both parties hereto, that no appropriation was in any way made by the 28th Wyoming State Legislature convened at Cheyenne January 9, 1945, and adjourned February 17, 1945, which in specific terms referred to or authorized the education of prisoners of war through the use of state moneys. The only appropriation to which our attention has been directed is that

found in Section 7 of Chapter 85, Laws of Wyoming, 1945, designated "General Appropriation Act," for the two years ending March 31, 1947. Section 7 incorporates the heading "Department of Education" and the last item in that section is stated thus:

"Contingent, Division of Vocational Education, Fifty Thousand, Nine Hundred, Forty Dollars ($50,940.00). Approved for $46,000.00."

We conclude from an examination of this language that the legislature aforesaid appropriated state funds for the contingent of the Division of Vocational Education in the department last mentioned, the sum of $50,940.00 which was approved by the Governor for only $46,000.00 and became available for use in the sum so approved. This "General Appropriation" Act became effective "from and after March 31, 1945," having been approved by the chief executive of the State on February 16 of that year.

The case of State v. Jack, State Auditor, 58 Wyoming 108, 125 Pac. 2d 165, was an original proceeding for a write of mandamus by the State on the relation of an attorney at law, to be issued to the State Auditor compelling him to approve for payment certain vouchers drawn on the Sales Tax Contingent Fund (Laws of Wyoming, 1941, Chapter 132, Section 53), in payment of the attorney's salary claimed to be due for certain services rendered the Sales Tax Division of the Board of Equalization. Sustaining a demurrer to the petition and ordering a dismissal of the suit, this court pointed out that:

"However, the Budget law is designed to govern the expenditure of moneys appropriated. Section 103-309, Wyo. R. S. 1931, was enacted in 1919. Section 9, Chapter 132 of the Session Laws of Wyoming, 1931 (R. S. 1931, Sec. 16-119), provides that:

"After the approval of any appropriation by the Legislature, * * * it shall be unlawful to expend any

such appropriation or any part thereof except in accordance with such estimate or the specific appropriation thereunder unless the same be revised with the approval of the Governor in writing.'

"Certainly this later provision of law controls the manner of spending the money appropriated by the Legislature. The approval of relator's employment by the Board of State Supplies under Section 103-309, supra, could not require defendant to order payment of the vouchers in question unless authority therefor can be found in the appropriation act itself, or in the budget estimates on which the act is based, or in some lawful revision or amendment of the budget estimates."

Section 16-119 referred to in the above excerpt is now Section 20-719 Wyo. C. S., 1945.

In an endeavor to bring the four vouchers in question here within the requirements of the law as announced in the excerpt just quoted, it is suggested on behalf of petitioner that on Page 6 of the Wyoming State Budget, 1945-1947, the estimated requirements of the Division of Vocational Education for that biennium was the sum of $65,740.00; that on Page 12 of that pamphlet, under Summary of Expenditures — Division of Vocational Education, appears the sum of $24,000.00 as the estimated requirements for said biennium as "reimbursements," the same statement appearing later on that page under "Detail of Expenditures"—"Estimated Requirements"; that the Governor on Page 13 of said budget pamphlet supported the foregoing request for a total appropriation of $65,740.00, saying:

"If vocational training is to be expanded in the State of Wyoming, it will require additional funds to take care of this expansion;"

that on March 14, 1945, the Division of Vocational Education submitted to the Governor a "revised estimate" which the executive approved five days later, and this revised estimate included within the $46,000.00

contingent appropriation allowed as above stated the following expenditures, to-wit:

"Reimbursement, Agriculture ........................$1,500.00
Reimbursement, Trade and Industry............ 3,000.00
Reimbursement, Home Economics................. 5,000.00"

Recurring to the provisions of the Smith-Hughes Act heretofore quoted, it is also suggested that said funds are required to be matched out of state funds for the "payment of salaries of teachers, supervisors, etc., and such funds are used to reimburse schools and others conducting classes in vocational education for expenditures theretofore made to such teachers and supervisors;" and then the last sentence in Section 24 (U. S. C. A.), hereinbefore set forth, is quoted.

The contention is thereupon made by the petitioner that the unusual and special "training program" resulting in the four vouchers aforesaid complies with the rule announced in the Jack case, supra, because—to use counsel's language—

"The Budget Estimate does not restrict to whom reimbursements may be made, no restrictions are contained in the Appropriation Act as to how the money shall be expended, nor does the Revised Estimate, approved by the Governor, contain any restrictions.

"We can, therefore, assume that it was the intent of the Legislature in making the appropriation that such funds could be expended for the purpose of cooperating with the Federal Government in providing vocational education, and that what constituted vocational education was left to the determination of the State Board of Education and the United States Office of Education."

Succinctly, as we understand the contention thus made, it is argued that because the word "reimbursements" is used in the budget for the 1945-1947 biennium with relation to the estimated expenditures of the "Vocational Education Fund" that that fact brings the matter at bar within the rule of the Jack case, supra. We are unable to acquiesce in this view of the matter,

and this for a number of reasons, among which are: The word "reimbursements" is a word of general signification and customarily means merely, according to well-known English lexicons, a "refund," a "payment back." So the court in Henrico County v. City of Richmond, 177 Va. 754, 15 S. E. 2d 309, 324, quoting a former opinion, said:

"Reimbursement is, therefore, construed by this Court in its primary meaning to mean to secure a return or restoration of an equivalent for something paid or expended; reimbursement means refunding or repayment."

This meaning can hardly be extended to show that the legislature intended to include a continuation of the Federal War Production Training Program after it had been brought to an end on June 30, 1945, simply because it is alleged in petitioner's pleading that it was agreed that relator would pay the salaries of instructors for war prisoners employed by relator and that the State Board of Education would "reimburse" it from state funds.

As a matter of fact, if petitioner's contention were here upheld, it would seem that the State Board of Education or the Director of Vocational Education could use the appropriated funds, the tax, and other moneys of the state, for any purpose they please to designate vocational training so long as there was involved in general terms a "reimbursement." However, in the budget for the biennium of 1939-1941 on Page 11 thereof, and that of 1941-1943 on Page 9 thereof, and for that of 1943-1945 also on Page 9 thereof, we find the same word "reimbursements" used in the detailed statements of the Division of Vocational Education in the Department of Education's estimated expenditures. In the first two budgets referred to in the preceding sentence, an itemized breakdown of the "reimbursements" appropriations show them to be for certain stated amounts as

estimated requirements of reimbursements for "Agriculture," "Trade and Industry," and "Home Economics," while in the third budget mentioned above (1943-1945) only a lump sum for all estimated "reimbursements" is set out as is the case in the 1945-1947 budget here involved.

During all those years there is no suggestion apparent that the budget estimates or the appropriation acts pursuant thereto were intended to include any such unusual and extraordinary expense for instruction such as is here sought to be upheld. Indeed, in connection with the "Summary of Expenditures — Division of Vocational Education," we find in explanation of the estimated requirements of $65,740.00 for the biennium of 1945-1947 on Page 11 of the budget, the note:

"No budget request is made for the Cooperative Vocational Education Fund. Allotments are made by United States Office of Education and sent to states. They are made as follows for one year: Vocational Agriculture, $30,000.00; Home Economics, $20,000.00; Trade and Industrial, $30,000.00; Teacher Training, $20,000.00. These funds must be matched by state funds or local funds. Most of the money is used to reimburse school districts in the state to assist in cost of conducting vocational education program. State money used for matching these federal funds comes from the Vocational Education Contingent."

The word "reimbursement" over the years evidently was intended to refer to repayments of funds advanced by school districts and other state and municipal training course authorities in vocational education fairly contemplated in the purview of the Smith-Hughes Act, aforesaid, and Sections 67-644, 67-1208, and 67-1210 Wyo. C. S., 1945. In that division of the report of the State Superintendent of Public Instruction to the Governor and the State Legislature for the two years ending June 30, 1946, entitled "Report of the Division of Vocational Education," certain types of classes in different

schools of the State and their location are listed as giving training in auto mechanics, machine shop, carpentry, electricity, radio, arc welding, and timber cutting. Such vocational education was obviously intended for citizens and residents of this State and not for the benefit of alien enemies brought here by force through the national government functions as prisoners of war.

The language used by Lord Esher, M. R., in the case of Colquehoun v. Heddon (1890), 25 Q. B., Div. 129, quoted in Griggs v. Thulemeyer, 41 Wyo. 36, 282 Pac. 27, may again appropriately be recalled at this point in connection with the interpretation of general words in the statute and their proper application to the pleaded facts as they appear in the case at bar. That language is:

"But it seems to me that our parliament ought not to deal in any way, either by regulation or otherwise, directly or indirectly, with any foreign person or thing which is outside its jurisdiction, and, unless it does so in express terms so clear that their meaning is beyond doubt, the courts ought always to construe general words as applying only to persons or things which will answer the description, and which are also within the jurisdiction of parliament."

The policy of this State in educational matters is made reasonably clear by the following excerpts from our State Constitution; Article I, Section 23, reading:

"The *right of the citizens* to opportunities for education should have practical recognition. The legislature shall suitably encourage means and agencies calculated to advance the sciences and liberal arts." (Italics supplied.)

Article VII, Section 9, stating that:

"The legislature shall make such further provisions by taxation or otherwise, as with the income arising from the general school fund will create and maintain a thorough and efficient system of public schools, *adequate to the proper instruction of all the youth of the state,* between the ages of six and twenty-one years, free of charge; * * *." (Italics supplied.)

and Article XXI, the "schedule," Section 28, whose language is:

"The legislature shall make laws for the establishment and maintenance of systems of public schools which shall be open to *all the children of the state* and free from sectarian control." (Italics supplied.)

Additionally may be noted the provisions of Section 3 of Article XIX of our fundamental charter which declare that:

"No person, not a citizen of the United States or who has not declared his intention to become such, shall be employed upon or in connection with any state, county or municipal works or employment."

Would it not appear somewhat strange that state moneys could not be paid to aliens for labor on public works, but it should be urged as quite proper to pay instructors for enemy aliens captured by the forces of the United States Government through the fortunes of war, held in this State by force, compelled to work on private enterprise after the War Production Training Program had been brought to an end, and required under the terms of international law to be repatriated upon cessation of hostilities?

In State v. Emery, 224 N. C. 581, 31 S. E. 2d 858, the court observes that "all agree that a statute is to be interpreted as it was intended to be understood at the time of its enactment * * *." See also Farmers Automobile Inter-Insurance Exchange, Etc., v. MacDonald, 59 Wyoming 352, 140 Pac. 2d 905, and authorities cited. In connection with this principle, it may be pertinently inquired whether in 1917, when the Smith-Hughes Act was passed by the United States Congress and when the legislature of this State accepted its provisions in aid of vocational education in this State and throughout the years following to June 30, 1945, such legislation was intended to be understood as authorizing the use

of both federal and state funds for the education of war prisoners which might be brought here under the circumstances hereinbefore described. We hardly think that either the national or state law-making bodies had any such intendment in mind when these laws were put upon the statute books. Indeed, any affirmative thought in the matter is repelled emphatically by the allegations of petitioner's pleading which set forth the fact that the instructors of war prisoners were "paid" from "federal funds" only, appropriated for that specific purpose (see Paragraph 8 of petitioner's pleading hereinbefore quoted).

In accord with what has been suggested in the preceding paragraph, it will be recalled that the 28th Wyoming Legislature was in session during 40 days in the months of January and February, 1945, as stated above. At that time the war in Europe, in which this nation was engaged, was in a critical state. No one knew when it would terminate. The State Legislature knew or should be held to have known that the national Congress had appropriated federal funds for the carrying on of a "War Production Training Program" and that the salaries of instructors thereunder were being paid for with federal funds alone, state agencies being invoked only for the purpose of the ministerial service of paying the instructors engaged in that work. Knowing these facts, it is difficult to perceive how the 1945 legislature could possibly have intended its appropriation for the Vocational Contingent Fund in the General Appropriation Act aforesaid could or should be used to pay the salaries of instructors under the above mentioned War Production Training Program. As already noted at the time that appropriation act was passed and approved, the prisoners of war instructors were being paid for by federal funds only and the only reasonable and natural legislative conclusion would seem to be that such payment would be continued at least until the state law-

making body was advised that a change in the source of payment would be made. The War Production Training Program, as we learn from official reports, began July 1, 1940, and was—as alleged in petitioner's pleading—brought to a close on June 30, 1945.

Our search through the General Appropriation Act for 1945-1947 or the budget estimates has failed to disclose even a hint that such an extraordinary expense as salaries for instructors of prisoners of war was intended by the legislature to be met by its appropriation for the Vocational Education Contingent for that period nor has our attention been directed thereto by petitioner. It is unnecessary to cite authority to the point that in the interpretation of a statute the intention of the legislature which enacted it must control. Without some clear authorization of that character by the legislature itself, we do not think state moneys could be used for such a purpose. Under the provision in the Smith-Hughes Act hereinbefore quoted (Section 19 of Title 20 U. S. C. A., supra; Ch. 114, Section 9, 39 Stat. at Large 933), and which we here repeat for emphasis and convenience only:

"The moneys expended under the provisions of this chapter, in cooperation with the states, for the salaries of teachers, supervisors, or directors of agricultural subjects, or for the salaries of teachers of trade, home economics, and industrial subjects, shall be conditioned that for each dollar of Federal money expended for such salaries the state or local community, or both, shall expend an equal amount for such salaries,"

no federal money either, under state custody, could properly be obtained and employed for this purpose.

What has been said above has been stated upon the assumption that the State Board of Education itself acted in this matter and determined that the training of war prisoners should continue even after the federal authorities had brought the War Production Training

Program and the expenditure of federal moneys thereunder to a close on June 30, 1945. But an examination of petitioner's pleading will show that this assumption is contrary to the fact.

An administrative board speaks only through its records. Commonwealth ex rel Watkins v. Winchester Water Works, 303 Ky. 420, 197 S. W. 2d 771. It will be recalled that in Paragraph 10 of petitioner's pleading hereinbefore quoted verbatim, the official minutes of the regular meeting of the State Board of Education held on April 9 and 10, 1945, disclose that the training of prisoners of war for the Crow Lumber Company was "explained and discussed." Then the two following sentences from the minutes recite that:

"'*If* this type of training *is needed after the close of War Production Training,* it was decided to continue the training under the regular Trade and Industrial Education program. *As to whether or not training was to be continued was left to the decision of the State Director of Vocational Education.*" (Italics supplied).

In other words, the crucial and important question of what policy should be pursued in the matter of continuing this training program, and whether it was needed or not, was not determined by the board acting in its official capacity but the determination of that vital question was left entirely to the decision of an employee of the board, viz., the State Director of Vocational Education. At the time the board met it was apparent that the war in Europe was about to end. V-E Day came soon thereafter, on the 7th day of the month of May, 1945. Evidently the close of the War Production Training Program appeared imminent, coincident with the duty incumbent upon the United States to return these prisoners of war to their respective homelands. Could a decision of this important and discretionary character be thus delegated by the board? We think not.

42 Am. Juris. 387, Section 73, states that:

"It is a general principle of law, expressed in the maxim 'delegatus non potest delegare' that a delegated power may not be further delegated by the person to whom such power is delegated. Apart from statute, whether administrative officers in whom certain powers are vested or upon whom certain duties are imposed may deputize others to exercise such powers or perform such duties usually depends upon whether the particular act or duty sought to be delegated is ministerial, on the one hand, or, on the other, discretionary or quasi-judicial. Merely ministerial functions may be delegated to assistants whose employment is authorized, but there is no authority to delegate acts discretionary or quasi-judicial in nature."

See also State ex rel Wolyn v. Apalachicola Northern R. Co., 81 Fla. 394, 88 So. 311, which holds that: "An administrative board cannot legally confer upon its employees authority that under the law may be exercised only by the board, or by other officers or tribunals." We are aware that thereafter in petitioner's pleading general allegations appear which would seem to indicate by inference that the board approved the continuance of the training of these prisoners of war. Nevertheless, it is our view that such general allegations are controlled by the specific allegation of what the board actually did as shown by its official record pleaded as recited above. 49 C. J., 119, Section 111, citing abundant authority, says that:

"Where both general and specific allegations are made respecting the same matter, the latter control; and the rule is applicable to inconsistent allegations of a conclusion and the special fact from which it is drawn."

So, in Thomas v. Ogden State Bank, 80 Utah 138, 13 Pac. 2d 636, it is stated: "It is a familiar rule in pleading that general allegations are controlled by special allegations inconsistent therewith. State v. Rolio, 71 Utah, 91, 262 P. 987; 49 C. J. 119." It will be noted also that the four vouchers here in question were not

approved by the President and Secretary of the Board of Education or either of them but by only a member of the Board and the State Director of Vocational Education. As set forth above, neither had any power to act in this matter, and for this reason alone, the Auditor could rightfully refuse to approve the vouchers or to issue warrants for their payment.

Again we are obliged to inquire what position the State Auditor occupies with relation to federal moneys appropriated by Congress for expenditure on account of the purposes governed by the Smith-Hughes Act, supra. He is not mentioned in that act so far as has been called to our attention and our examination of the act has led to the same conclusion. The same is true of his position under Section 67-1201, Wyo. C. S., 1945, quoted above, announcing the acceptance by the State of Wyoming of the provisions of the Smith-Hughes Act.

However, under Section 18-303, Wyo. C. S., 1945, defining the duties of the State Auditor, he is required to:

"First—*Audit and settle all claims against the state payable out of the treasury, except only such claims as may be expressly required by law to be audited and settled by other officers and persons.*

"Second—*Draw all warrants upon the treasurer for money,* except only in cases otherwise expressly provided for by law." (Italics supplied).

Turning now to the State Treasurer's status under the Smith-Hughes Act, we find, as already shown by the quotation verbatim of Section 13 of that act (Section 23 of Ch. 2 of Title 20, U. S. C. A.), that the several states in order to obtain the benefits of that law:

"shall, through the legislative authority thereof, appoint as custodian for said appropriations its State Treasurer, who shall receive and provide for the proper custody and disbursements of all money paid to the State from said appropriations. (Feb. 23, 1917, c. 114, § 13, 39 Stat. 935.)"

The State of Wyoming complying with this mandate of the federal act in the last paragraph of Section 67-1201, Wyo. C. S., 1945, as we have already observed, declared that:

"The State Treasurer is appointed custodian of funds allotted by Federal Act to the State of Wyoming for the promotion of vocational education, and he shall provide for the proper custody and disbursement of such funds on the requisition of the State Board of Education."

Then there is also the provision in Section 14 of the Smith-Hughes Act quoted above (Section 24 of Ch. 2, Title 20, U. S. C. A.) reading:

"The moneys so received by the custodian for vocational education for any State shall be paid out on the requisition of the State Board as reimbursement for expenditures already incurred to such schools as are approved by said State Board and are entitled to receive such moneys under the provisions of this chapter."

From a study of the several statutory provisions, supra, we think that so far as the state money appropriated by the legislature for the Vocational Education Contingent is concerned, the Auditor is required to "audit and settle" all vouchers drawn on that contingent, of course, determining that they have been properly approved by competent authority, that the legislature has duly appropriated funds for the purpose for which the vouchers are drawn and deciding also whether the claim is a proper charge against the appropriate state fund. As said in People ex rel McCabe v. Matthies, 179 N. Y. 242, 72 N. E. 103, 104, quoting and adopting the definition given in an earlier case:

" 'To audit is to hear, to examine an account, and in its broader sense it includes its adjustment or allowance, disallowance or rejection.' People ex rel Myers v. Barnes, 114 N. Y. 317, 323, 20 N. E. 609, 610; People ex rel Brown v. Board of Apportionment, 52 N. Y. 224, 227."

Relative to the handling of federal funds coming into the State Treasurer's custody under the Smith-Hughes

Act, we are especially aided by the decision of the Comptroller General of the United States of date April 21, 1923 (2 Dec. of the Comp. Gen. 685), which, so far as we know, appears not to have been subsequently altered. In that matter the Director of the Federal Board for Vocational Education called the attention of the Comptroller to the fact that a suit had been brought by the State of Kansas "against its state Treasurer and its Auditor" in re the handling of federal money paid over to the State under the Vocational Education Act of February 23, 1917 (the Smith-Hughes Act aforesaid). Certain questions arising out of the litigation were submitted to the Comptroller for his answer. After reviewing the preceding sections of the Act, Section 13-17 inclusive, are quoted verbatim and then this is said:

"While these moneys were appropriated for the use of the States, to be paid over to custodians appointed by the State and disbursed on requisitions of State boards, subject only to the annual reporting of receipts and expenditures required by Section 8 of the act, they are not given outright to the States. The purposes for which they may be expended by the States and the terms and conditions governing such expenditures are prescribed by the Federal statute. The States hold the money in custody for such expenditure only as is provided for by the statute. Under Section 15 all unexpended balances of yearly allotments are, in effect, returned to the United States through the procedure of deducting such balances from the next yearly allotment. The provision of Section 16 authorizing the withholding of the yearly allotment of any State when the Federal board shall determine that moneys previously allotted and paid are not being expended for the purposes and under the conditions of the act is equivalent to recovery from the State of money not lawfully expended in accordance with the Federal statute. Thus, while the Federal Government does not directly control the custody and expenditure of these funds, it retains supervision over the expenditure and the right to enforce the statutory provisions by the statutory procedure."

` The question and official answers thereto, which we deem material here, are as follows:

"Question: Does Federal money paid over to a State under the vocational educational act become State money as soon as it comes into the State? Or does it remain Federal money?

"Answer: Money paid over to the States is held in custody by the States for the specific purposes provided for by the Federal statute. The State has the unrestricted control over the custody and expenditure of the funds for such purposes, but has no absolute, unrestricted right, title, or interest in the moneys. When it has paid the money over to the States, the Federal Government has parted with its right to control the custody and disbursement of the funds, except in so far as proper accounting therefor may make necessary, and retains its right to supervise the disbursements and to hold the State responsible for lawful expenditure of the money.

"Question: As custodian, is the State Treasurer bound to protect the Federal money in his custody against appropriations by the State legislature, and against all requisitions except such as are made upon him by the State Board for Vocational Education?

"Answer: I think he is, but his responsibility is to the State, which in turn is responsible to the Federal Government for lawful expenditure of the funds under penalty of being refused further allotment if expenditures are in violation of the Federal statute.

"Question: Has the Federal Government any control over the handling of Federal money paid over to the State?

"Answer: No; except that proper accounting be provided for.

"Question: If the State Treasurer, acting as custodian of the Federal money, pays out this money under appropriations of the State legislature and not on requisitions by the State board, can the Federal Government recover this money?

"Answer: A withholding would be authorized on the next allotment as provided by Section 16 of the Federal

statute, in case the Federal board should determine that the payments were not such as are contemplated by the statute."

In connection with the rulings of the Comptroller General as thus recited may very well be considered the case of State ex rel Board of County Commissioners v. Snyder, 30 Wyo. 468, 222 Pac. 40, a writ of mandamus suit against the State Treasurer on relation of the Board of Commissioners of Goshen County to compel payment to relator of a tax reimbursement where the law provided such reimbursements by the State Treasurer to the several counties for tax losses on account of the so-called soldiers exemption statute which, in part, provided:

"It shall be the duty of the several County Treasurers * * * to submit to the State Treasurer * * * a certified statement of the exemptions allowed by said counties * * *, and * * * said State Treasurer shall reimburse each of said counties to the actual amount of the county tax on such property exempted * * *."

The Treasurer declined to act, though the relators had properly certified the amount required for county reimbursement and submitted same to that official, his argument being that he could make no payment except upon the auditor's warrant, and none had been drawn. Holding this was no obstacle to the ultimate payment, the court said:

"By the provision that the several County Treasurers shall submit to the State Treasurer 'a certified statement' of the exemptions in said counties under the statute, it is clearly intended, we think, that the amount payable to each county shall be determined by the State Treasurer, and that the said certified statement shall furnish the necessary information for such determination. And the State Treasurer may, no doubt, require that said certified statements of County Treasurers shall be reasonably sufficient in form and substance to show the facts and figures necessary to a proper determination of the amount or amounts due. It is necessary,

however, that he should have the auditor's warrant before paying out the money from the treasury; but we can see no objection to the issuance of the required warrant upon a certificate of the State Treasurer filed with the Auditor, showing the several amounts due as determined by him, with a request of the Treasurer for the warrant in each case, notwithstanding the absence of specific authority in this particular statute for that part of the procedure. The statute does declare expressly that the Treasurer shall reimburse the counties."

In the case at bar we think the Auditor under both the Smith-Hughes Act and this State's statutory acceptance thereof (Section 67-1201, supra) could before drawing a warrant to pass the four vouchers for payment require a certificate from the State Treasurer that, as directed by the statutes, the State Board of Education had made an official "requisition" on this officer for the disbursement of these Federal funds for the promotion of vocational education. In petitioner's pleading now before us, it is nowhere alleged that any requisition was made by the State Board upon the Treasurer, and it is our understanding that there was none presented. Yet, under the law as reviewed above, it would seem reasonably clear that such a requisition would be quite necessary before the machinery for payment of vouchers of the character now before us could be set in motion. The statutes, both State and Federal, would appear to make this requirement. It is true there is an allegation (Paragraph 15 of petitioner's pleading, supra) stating that a stated practice had been followed for many years in withdrawing Vocational Education Funds. Yet petitioner concedes it "has been impossible to determine what brought about this procedure with regard to the disbursement of the Federal funds."

In 42 Am. Juris. 406, Section 82, it is pointed out, supported by the citation of many Appellate court decisions, that:

"Administrative construction does not control the court's decision as to the proper interpretation of the law, and where it is manifestly wrong or clearly erroneous it will not be followed, but will be rejected."

This court has adopted the same rule in Hodgell v. Wilde, State Examiner, 52 Wyo. 310, 74 Pac. 2d 336 and other cases therein cited. In the Hodgell case this was said:

"In this connection we are reminded by appellant of the rule for the judicial interpretation of statutes, which declares that the construction given a law over a long period of time by the department or officer charged with its administration should be assigned great weight, and, as the district court found that previous State Examiners have interpreted the law as requiring 'all of the sums collected by reason of stockholder liability of the shareholders of such banks shall be paid upon claims of the commercial department creditors only,' this should be the construction given the law here. But the principle suggested is only applicable when the executive construction of the statute is not clearly erroneous. State ex rel Murane v. Jack, (Wyo.) 70 Pac. (2d) 888; State ex rel Goshen Irrigation District v. Hunt, 49 Wyo. 497, 57 Pac. (2d) 793; State ex rel Cross v. Board of Land Commissioners, 50 Wyo. 181, 58 Pac. (2d) 423. We are constrained to say that in our judgment the clear language of the statute involved is so specific in directing the funds derived from the liability aforesaid to be used to 'make good the contracts, debts or engagements' of the institution that the conclusion announced above is the only one possible without doing violence to its plain meaning."

The statutes in the case at bar are as we have seen specific and clear on the point and may not be overlooked.

It may be observed as significant also that two State Auditors have declined to pass these four vouchers for payment by the issuance of warrants therefor. In the case of State ex rel Sullivan v. Schnitger, Secretary of State, 16 Wyo. 479, 95 Pac. 698, certain well-known

principles relative to the issuance of the writ of mandamus are announced which should be kept in mind in the disposition of this case. There this court said:

"It will only issue in the sound discretion of the court. (People v. Olson, 215 Ill., 620, 622; 33 Cent. Dig., 5 Col. 2053.) Such discretion means only that the question as to whether the writ ought to issue depends upon the result of a judicial examination of the facts either as alleged or in proof. Such facts or proof must show at least a clear legal right in the relators and that mandamus is the proper remedy. The relators must show a clear legal right to which they are entitled and which is withheld or threatened to be withheld from them, and that it is the legal obligation or duty of the respondent to perform the act sought to be coerced and that the performance of such act can only be secured through and by means of the writ."

It has also been held that the writ of mandamus should not be granted when it is evident that substantial rights of parties not before the court are involved. Bigham v. State ex rel Ocala Brick & Tile Company, 115 Fla. 852, 156 So. 246. It would seem unjust to issue the writ sought for here when the officer, the State Treasurer, whose duty and right it is to provide for the proper disbursement of the funds involved is not before this court. Indeed, it seems only fair that he should be given an opportunity to present his views upon whether any or a proper requisition had theretofore been made upon him by the Board of Education.

45 Code Fed. Reg. p. 5, § 1.7 (1939) declares, concerning Federal Vocational Training Funds, that:

"The State Treasurer is responsible for the proper custody of all Federal Vocational Education Funds placed in his care, for the disbursement of these funds upon requisition of the State Board and for accounting for the interest earned on these funds. He is required by the terms of the act of acceptance to honor requisitions issued by the State Board. Whether or not these requisitions are properly signed and duly executed is, of course, a question which he will determine before

honoring them. The question of whether or not any given expenditure is made for a purpose or for purposes set up in the Federal laws is one entirely between the Office of Education and the State Board, and one over which the State Treasurer has no control and for which he has no responsibility. (Secs. 13, 14, 39 Stat. 935; 20 U. S. C. 23, 24.)"

It might well be in other cases of this character, if they should arise, that the Auditor and the Treasurer might not agree as to what constituted a proper requisition upon the latter or whether any requisition at all had been made upon him by the State Board of Education. In such event the question would become a legal problem to be resolved by the courts.

Our attention has been directed by respondent to Section 6a of Ch. 541 of 49 Stat. at Large 1488, 1490, quoted in full above which forbids expenditure of funds appropriated under the Smith-Hughes Act "in industrial plant training programs" unless that training "be bona fide vocational training and not a device to utilize the services of vocational trainees for private profit." Remembering that the War Production Training Program was brought to a close by Federal authority on June 30, 1945, evidently because the need therefor had ceased, and that the first sentence of the excerpt from the Board of Education minutes recited above states that "the training of prisoners of war for the Crow Lumber Company was explained and discussed," it is pertinent to inquire who really received the benefit of such training during the months of August, September, and October, 1945. We are unable to see that either the State of Wyoming or the National Government were aided except incidentally during those months by this unauthorized prolongation of the training of prisoners of war. Assuming, as alleged in petitioner's pleading, that these employees were then unskilled and required training, then the profit arising from any improve-

ment in their ability to perform their tasks in relator's business through the aid of instructors paid from State or Federal funds would appear to have accrued to the relator chiefly. If they were already sufficiently trained as might be inferred from the official cessation of the War Production Training Program, there was no need of instructors and the payment of their salaries as employees of the relator—as on the oral hearing of this case we were informed they were—would be as respondent insists, part of the cost of continuing relator's own business, it being not an eleemosynary corporation but one conducted for "private profit." We do not believe that the moneys of the citizens of this state, obtained through taxation and other sources, should be used for any such purpose.

In conclusion, we deem it proper to call attention to our Rule 28 which, as often said in the past, has the force of statute. Its language is in part:

"In any application made to the court for a writ of *habeas corpus, mandamus, quo warranto,* or for any prerogative writ to be issued in the exercise of its original jurisdiction and for which an application might have been lawfully made to some other court in the first instance, the petition shall, in addition to the necessary matter requisite by the rules of law to support the application, also set forth the circumstances which, in the opinion of the applicant, render it necessary or proper that the writ should issue originally from this court, and not from such other court, and the sufficiency or insufficiency of such circumstances so set forth in that behalf will be determined by the court in awarding or refusing the application."

An examination of petitioner's pleading fails to disclose any effort therein to comply with this rule.

Where an application for an original writ of quo warranto was sought in this court in State ex rel. Walton vs. Christmas, 48 Wyo. 239, 44 Pac. 2d 905 we said:

"Assuming that a district judge is a state officer within the meaning of § 3 of article 5 of the constitution, we are of opinion that the original jurisdiction of this court in *quo warranto* for the purpose of contesting his election is not exclusive and should be exercised only on those cases where, in accordance with rule 28, supra, it is shown that 'it is necessary or proper that the writ should issue originally from this court.'"

Without further extending this opinion we are obliged to conclude that the demurrer to the petitioner's pleading should be sustained and the case dismissed and it will be so ordered.

*Writ Denied and Case Dismissed.*

KIMBALL, J., and BLUME, J., concur.