SCHOOL DISTRICT NO. 9, IN COUNTY OF FREMONT, and State of Wyoming, Barbara Myers, H. D. Culver and Virginia Shaw, the duly elected, qualified and acting Trustees of School District No. 9, Fremont County, Wyoming, in such capacity and individually as patrons, electors and taxpayers of said School District, Western Nuclear Corporation, a corporation, a taxpayer of said School District No. 9, Grieve Land and Cattle Company, a corporation, a taxpayer of said School District No. 9, in County of Fremont, and State of Wyoming, all for themselves and for benefit of all other patrons, electors and taxpayers of said School District No. 9, in County of Fremont, and State of Wyoming, Appellants (Plaintiffs-in-Error below),

v.

DISTRICT BOUNDARY BOARD IN AND FOR FREMONT COUNTY, Wyoming, and School District No. 25, in County of Fremont, and State of Wyoming, Appellees (Defendants-in-Error below).

No. 2900.

Supreme Court of Wyoming.

March 30, 1960.

W. A. Smith, Smith & Nicholas, Lander, and Harold M. Johnson, Rawlins, for appellants.

G. L. Spence, Riverton, for Dist. Boundary Bd.

James L. Hettinger, Moran, Hettinger & Leedy, Riverton, for appellee School Dist. No. 25.

Before BLUME, C. J., and PARKER and HARNSBERGER, JJ.

Mr. Justice PARKER delivered the opinion of the court.

This case relates to boundary changes of school districts in Fremont County, Wyoming, under § 21–211, W.S.1957.[1] On May 22, 1957, the chairman of the board of trustees of School District 25, wrote to the board of county commissioners asking that a meeting of the district boundary board be called to consider the transferring of two or three southern tiers of townships from District 40 to District 25. The chairman of the board of county commissioners called a meeting of the boundary board to sit on June 5, 1957, at which time the commissioners and county treasurer were present, as were a number of interested citizens. The county superintendent was absent from the State during the month of June until about July 3; and Mattie Lee Brown, a receptionist in her office, attended the purported boundary board meeting and took minutes.

Another meeting substantially similar was held on June 18, and Mattie Lee Brown was appointed as deputy county superintendent by the chairman of the board of county commissioners, the other commissioners concurring.

On July 2 at a regular meeting of the county commissioners, whereat Mattie Lee Brown was present, matters relating to the change in boundaries were again discussed and provision made that on July 9 the boundary board would meet with taxpayers of School Districts 9 and 11 to discuss the matter of their becoming a part of the Fremont County Vocational High School District. A July 2 letter from School District 25 was presented to the commissioners, asking that the boundary board consider the addition of Townships 33 (the southern tier of townships of District 40) and 32 (the northern tier of townships of District 9) to School District 25.[2] After some discussion, the meeting closed with the understanding that any decision regarding the addition of Townships 32 and 33 to District 25 would be postponed until a boundary board meeting on July 9.

On July 3 the county superintendent returned, and on July 9 a meeting of the boundary board was held with all members present and with a substantial number of citizens from each of School Districts 25, 40, and 9 being in attendance. The meeting convened about 10 a. m. and continued until noon, at which time it was recessed until 2 p. m. About 1:30 p. m. the boundary board, meeting in private session, voted on the measure and established new boundaries whereby Townships 32 and 33 were added to District 25. At about two o'clock the boundary board announced its decision to the assembled citizens.

On July 24 School District 9 and certain of its taxpayers filed a petition in district court against the board, alleging that it had held a purported meeting on July 9 behind closed doors and thereafter the chairman had announced to assembled interested persons that pursuant to majority vote Townships 32 in School District 9 had been an-

1. "The county superintendent of schools, the county treasurer, and the board of county commissioners shall constitute a board for laying off their county into convenient school districts, such board to be styled 'the district boundary board.' Said board by a majority vote may divide the county into school districts, may alter and change the boundaries of the districts so formed from time to time and may at any time consolidate entire districts or portions of districts, when, in the opinion of such board such changes, alterations or consolidations may be justified by ex-

isting circumstances and conditions; but no existing district shall be divided in any manner which will leave the total assessed valuation of its property less in proportion to the number of children shown in its census than the average ratio for all school districts in the county, unless the trustees of such district agree thereto. * * *"

2. These townships constituted what is known as the "Gas Hills"—an area devoted to uranium mining.

nexed to School District 25; that the board's decision was unreasonable, unjust, and oppressive, amounting to a wanton disregard of the rights and interests of School District 9, its electors, patrons, and taxpayers; that the decision was not based or founded upon a consideration of substantial facts, was arbitrary, capricious, irregularly taken, and was against the best interests of the public. Petitioners prayed that the decision of the board be set aside and the board enjoined from further proceedings in the matter. A "transcript of the proceedings" (copies of various minutes and letters) of the board was attached to the petition as an exhibit. The boundary board entered an answer which was in effect a general denial, filed certain procedural motions, and when these were overruled by the court, moved for consolidation of the case (No. 9430) with District 40's appeal from the board's change in its boundaries (No. 9445). Appellants resisted the consolidation and also complained of the appearance of the county attorney in the cause, but neither the resistance nor complaint was favorably considered by the court, and the combined causes proceeded to hearing. The district court issued judgment for defendant boundary board in both cases, and District 9 has prosecuted this appeal.[3]

■ Appellants insist that the court erred to their substantial prejudice in several procedural matters. They have failed to cite any authorities to substantiate their views, and we are always reluctant to consider claimed error unsupported by precedent or cogent argument, but we think that the problems raised are of sufficient public interest to merit discussion.

■ Appellants point out that although the court's order which permitted the intervention referred to a "motion" of School District 25 asking permission therefor no such motion was ever filed and they insist further that the only pleading of District 25 was an unsigned answer filed

some sixteen days after the trial was concluded. Neither of these contentions are controverted. It is therefore clear that District 25 failed to comply with 24(c), W. R.C.P.:

"Procedure. A person desiring to intervene shall serve a motion to intervene upon all parties affected thereby. The motion shall state the grounds therefor and shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought."

These requirements are for the purpose of informing the affected parties of applicant's claim and permitting a hearing thereon as a basis for the court's determination of the right to intervene. International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, Local Union No. 523, of Tulsa, Oklahoma v. Keystone Freight Lines, Inc., 10 Cir., 123 F.2d 326. We think that District 25 having failed to comply with the rule did not become a party to the action; however, no prejudice is shown to have existed by reason of the purported intervention.

■ Appellants further contend that the court placed them at a disadvantage by setting the pretrial conference and the trial "for the same time, forcing trial when the record was not complete and the issues were not fully made." The record discloses that the pretrial order in this case was dated the same day as the trial ended and was not filed until thirty-nine days later. Such precipitant handling of the trial immediately following a pretrial conference although not contrary to the words of Rule 16, W.R.C.P., is, nevertheless, contrary to the basic reasons for the existence of the rule and to the best interests of procedural justice. The philosophy actuating adoption is well summarized in the committee report on pretrial clinic, 4 F.R.D. 35, 98, 99:

"(5) The Committee approves of the practice of the great majority of the

3. No. 9445 has not been appealed, and the board's determination to transfer Township 33 from School District 40 to School District 25 stands unchallenged.

judges using pre-trial procedure regularly in holding the pre-trial conference shortly before the time when the actual trial will be scheduled, the most preferable interval before trial being not less than one week or more than three weeks. In exceptional cases it may also be advantageous to call a pre-trial conference immediately after the joining of issue.

"(6) The Committee is impressed with the desirability of drawing up a pre-trial order while the parties are present, setting forth what has been agreed to or accomplished at the hearing."

In Burton v. Weyerhaeuser Timber Co., D.C.Or., 1 F.R.D. 571, 572, it was said that pretrial orders should be signed and filed "a reasonable time before trial." See also "Pre-Trial Techniques Of Federal Judges," 4 F.R.D. 183, 184, 185; and 1 Barron and Holtzoff, Federal Practice and Procedure, Rules Edition, 1946, § 471 and § 473 at p. 963. Although the setting of the case on the heels of the pretrial procedure was improper, the appellants have failed to substantiate any claim of prejudice against them, and we therefore find no reversible error on the point.

■ It is insisted that the court erred in permitting the county attorney to act for the boundary board, but authorities to substantiate the contention are lacking. There is no statute requiring the county attorney to act for the board, but this fact alone does not indicate the impropriety of the representation, and appellants have shown no prejudice to them.

■ Counsel complain that the "secret" meeting of the board demonstrates a fraudulent, wilful, wanton, and despotic attitude of the members. The only ground advanced as support of this view is the contention that under § 18–150, W.S.1957, the county commissioners should sit with open doors. Since the board of county commissioners and the district boundary board are not identical, it is doubtful that the mentioned statute is applicable. However, the very nature of the activities of quasi-judicial boards and agencies requires that their meetings be open to interested persons; and it has been held that even where there is no statutory requirement for notice of the proposed action in changing a school boundary reasonable notice is required to be afforded to interested persons. School Dist. No. 3, El Paso County v. Perry, 126 Colo. 443, 250 P.2d 1010; and see 42 Am.Jur. Public Administrative Law § 135. The right of the public to be aware that the hearings of such boards will take place and to present evidence before them should not prohibit such boards from having private sessions for planning or deliberation. In St. John's Roman Catholic Church of Stamford v. Board of Adjustments or Appeals of City of Stamford, 125 Conn. 714, 8 A.2d 1, 4, the court in discussing a charge that the deliberations of a zoning board must be public said:

"* * * We find nothing in the statute or in the charter or zoning regulations * * * which denies the board * * * the right which is well-nigh universally followed by such bodies, namely, after the public hearing of a matter of this character has been concluded, to retire for deliberation before announcing their final decision. * * *"

We think there was nothing improper in the boundary board's conducting of a private meeting for the purpose of considering evidence previously submitted.

■ It has been suggested by counsel that a district court's judgment in a boundary board dispute should be automatically stayed by an appeal to this court " 'for reasons of public policy,' " citing School Dist. No. 30 v. Consolidated School Dist. No. 30 Joint of Steele & Freeborn Counties, 151 Minn. 52, 185 N.W. 961. The Wyoming Rules of Civil Procedure grant the trial judge broad authority to prevent the effect of any judgment during the pendency of an appeal, and we see no occasion to establish types of cases which merit special consideration as to a stay of execution by reason of public policy.

We consider then the merits of this appeal. The only Wyoming case dealing with a like situation is Chicago, B. & Q. R. Co. v. Byron School Dist. No. 1, 37 Wyo. 259, 260 P. 537; and it is conceded that the principles therein enunciated must govern. The parties place different interpretations upon what was said in that case, and it is therefore desirable that we review its holding. Chief Justice Blume said at 260 P. 539, "we would be warranted in setting aside the action of the boundary board only where a clear abuse of discretion is shown, amounting practically * * to fraud." This statement has been interpreted as necessitating a showing of the board's having had some sinister intention, but there is no merit to such interpretation. The opinion in that case listed many specific factors brought out by the evidence, including assessed valuation and location of property, number of school children requiring education, and the distances required to be traversed by them. The opinion also discussed in some detail those situations which should be considered by the board in making its determination. The opponents of the boundary change had there contended that "only the interests of the people and the taxpayers of the annexed territory can be considered without reference to the interests of the people and taxpayers of the former district * *." 260 P. 540. Judge Blume was careful to point out that this view was entirely erroneous and said at 260 P. 540, "the welfare and interests of the district and of the people thereof as a whole must necessarily be the determining factor in order to make the organization of districts possible at all. We cannot see why a different principle should apply in making changes in districts already organized. * * * the ultimate purpose to be kept in mind necessarily is the giving of an education to the children in the community * * *." A careful study of the Byron case leaves no doubt as to the criteria which this court established over thirty years ago, i. e., a district boundary board in making a change must have before it sufficient information upon which it may properly find that it is to the best interests of the people in both the annexed and the annexing areas. It is therefore necessary here merely to examine the record in order that we may ascertain whether or not there was substantial evidence upon which the decision of the boundary board could reasonably have been based. In so doing we may not substitute our views as to what the best interests of the people were but are required to exercise care that the decision was not only based upon substantial evidence but also that such evidence related to both the annexed and the annexing areas.

Since § 21–212, W.S.1957, authorizes the boundary board to act only when the county superintendent and two members of the county commissioners are present, the propriety of the board's decision in the present instance must depend upon the evidence which was adduced before it at the one meeting of July 9, 1957. The portion of the secretary's official record of that meeting which relates to the present problem is:

"Mr. McGuire, the Chairman called the meeting to order explaining that it was a hold over of the meeting of July 5th 1957 and concerning the annexation of Twp. 32 & 33 to the Riverton School Dist. No. 25. This would sever portions of School Dist. No. 40 and No. 9. The petitions were not renewed. The Chairman then called upon Lauren Moran, attorney for the mining companies but in reality the financial petitioner of School Dist. No. 25.

"Moran gave a resume of the earlier petition giving as a reason that the children of the mining area were needing education and that the majority of the children of the mine workers had received education in Riverton the past year.

"First he cited that the School Dist wished only Twp No. 33 but the mining company having property in Dist No. 32 as well felt it would complicate

their bookeeping (sic) to have a portion of the area taxed at one levy, while another, by virtue of being in another twp or Dist, would have a different levy so the idea of taking another twp. was developed, lopping the valuation of Dist No. 9.

"Mr. Moran also brought out the idea if the workers were assured of a school (and which Riverton had promised) the company could the better retain their working personnel. Moran stated that he was not primarily interested in the School problem of Dist No. 25 only as it would relate to the interests of the Mining Companies, Luck Mac, Vitro and Fremont Metals, etc etc.

"Mr. Smith, attorney, representing the to be devoured Dist No. 40 and No 9 Gave a comprehensive picture, illustrated with a map, showing the effect such a cut on the valuations of Dist. No. 40 and No 9 would have on those Districts. The cut would extend further to involve other Dist. and on the levies of those two Districts, on their remaining taxable property. At the moment it was seriously crippling Dist No. 9 to have its value diminished when it was in the process of bonding and the construction of a school building adequate to take care of the children of the 220 families now located at Jeffry City.

"Neil Griffith, Rep. Western Nuclear pointed out that Jeffry City was an immediate potential center of population and not an assumption of 400 families as a calculation of Mr. Moran.

"Said he 'It would be more logical for the children from the Gas Hills area to be provided for educationally by their present Dist No 9, since it was 64 miles from the mining area to Riverton and only 30 miles to Jeffry City. There are more than 220 families at Jeffry City now and the problem of education will center as much at Jeffry city as it will at Riverton.

Since there can be no taxable gain why not await to see what the situation will actually be.'

"It was the contention of both the Rep. for this area that no alterations be made until the present boom in population in the area stabilize itself. Smith said: 'Wait until we see what the problem is before we act.'

"At a previous meeting July 2nd the Rep. from Dist No 40 Twp ——— had agreed on the annexation to No. 25 but great protests arose from the residents of that area so the Rep. Floyd Logan and David Knapp withdrew their consent. Mr. Ralph Linn opposed the action contending that Dist No. 40 had always taken care of the education of the children in their Dist and will continue to do do (sic). Quote 'Our records show that we have surpassed other Dist. in this respect.' 'Why should Dist No. 25 take care of the property problems of Dist. No. 40.' He said they had often maintained isolation instructional facilities for as few as one or two and were ready to meet the needs of the mining families even to the point of building a new plant if the conditions should warrant. Mr. Linn is a former School Trustee of the District involved No. 40.

"Mr. Harmon of No. 25 said a few words to the effect that Dist No 25 was prepared to furnish facilities to the mining area. Moran had earlier indicated that grades with an enrollment of 23–25 could be crowded up to 30 thus releasing one teacher for the new project. The Co. having indicated thru Moran that they could or would furnish a building.

"Mr. Quine, Luck Mac Supt. endorsed the request of Moran and advanced the idea of the growth of the area. Some 18 children are at camp now 5 of whom are High School students and would remain in town.

"Other persons spoke in favor of their respective Dist."

According to the minutes, little evidence was presented to the board relating to the transfer of areas from School District 9. There were eighteen children in the mining area who needed schooling (five of them were to go to high school), but there was no showing as to the part of the mining area in which they lived. For all that was said, there may have been no children residing in Townships 32, and no need for school in that area. There was no information as to assessed valuation, school census, or school needs in District 9 or any part thereof excepting the very general statements from Jeffrey City residents who were complaining about the proposed change. There was no evidence of assessed valuation, school population, or needs of District 25 and only a general statement as to the proposed efforts which that district was to take in furnishing education to the children in the "mining area." Although certain mining companies requested Townships 32 and 33 to be placed in one district in order to avoid complications in bookkeeping, and the board was entitled to consider this along with other factors, convenience or welfare of the taxpayer is not to be considered to the exclusion of the controlling purpose to be accomplished, i. e., the providing of educational facilities for the children in the community. Chicago, B. & Q. R. Co. v. Byron School Dist. No. 1, 37 Wyo. 259, 260 P. 537, 540. From the minutes then there was no showing that the board had before it adequate information upon which it could reasonably exercise discretion regarding the welfare and interests of the people in the entire area under consideration.

A portion of the minutes which discusses the private session of the boundary board recites the chairman's proposal to take the vote, the request of the secretary for discussion, and the taking of a vote. The county superintendent testified regarding this meeting, "When we got in there and closed the door * * * he [McGuire] said: 'All in favor say yes, and all opposed no.' I asked him, 'Would there be a discussion.' He said, 'Is a discussion necessary?' I said, 'Well, I didn't really know all the facts and incidents of the case.' * * * Mr. McGuire said, 'Well, we will take a vote.' We had a vote and it was three to two * * *. * * * Then we took another vote. * * * it was the same, three to two."

As we have indicated, we think there was nothing improper in the board's having a private session for the consideration of evidence which had been presented to it, but we cannot conclude otherwise than that the procedure there tended to be of an arbitrary nature. Apparently the three members of the board of county commissioners had already made up their minds, and the chairman was not amenable to the request that there be any discussion. Part of the potential benefit which accrues to the public from the establishment of quasi-judicial bodies comprised of several members is that they may take counsel one with the other. The refusal to do this although not a violation of law nevertheless indicates something less than a willingness to consider all pertinent information. Paola & Fall River Railway Co. v. Com'rs of Anderson County, 16 Kan. 302; Webster v. Texas & Pacific Motor Transport Co., 140 Tex. 131, 166 S.W.2d 75.

Although it has often been said that an administrative board speaks only through its records,[4] court and counsel in this case seem to have been in agreement that testimony of the witnesses to supplement occurrences before the board was competent evidence. We think this view was correct under the existing facts[5] since

4. State ex rel. R. R. Crow & Co. v. Copenhaver, 64 Wyo. 1, 184 P.2d 594, 608.

5. As to the supplementing of the minutes of board meetings, see Cagle v. Wheeler, 35 Tenn.App. 53, 242 S.W.2d 338; Spann v. Joint Boards of School Directors of Darlington Township, Darlington Borough and South Beaver Township, 381 Pa. 338, 113 A.2d 281; Commonwealth ex rel. v. Novinger, 7 Pa.Dist. & Co.R.2d 471; 32 C.J.S. Evidence § 878.

administrative agencies which meet infrequently and do not have means to report hearings verbatim can scarcely be expected to provide all-inclusive minutes. However, such testimony throws little light on the situation here because the witnesses tended to confuse the occurrences of June 5, June 18, and July 2 with those of July 9.

George McRae, the County Treasurer, said that the secretary's minutes were substantially correct but that he had pointed out to the members of the board that they had no figures as to the valuation per pupil and told them District 25 wouldn't get anything out of it that year because they could not change the assessment.

Matt McGuire, the chairman of the board of county commissioners and district boundary board, testified at some length but did not recount what happened at the meeting. He identified a letter dated July 15, 1957, signed by him and published in the Riverton and Lander papers wherein he explained for the board of county commissioners the situation regarding the boundary change. Neither the letter nor his reasons for the board's actions were competent to show what occurred at the meeting of July 9 and could not have been admitted over objection. Since the letter was ultimately received by agreement of counsel, we review it for whatever light it may shed:

"* * * Numerous families are living in Riverton currently as a result of the uranium activities in the Gas Hills area. Numerous other families are likewise now living in the Gas Hills Area, whose children must be educated, and numerous other families will be moving into the area within the very near future whose children likewise will require education.

"The Lysite Area indicated its inability to meet the current demand for education of the children within Township 33. Riverton, on the other hand, has expressed not only its willingness to undertake the education of these additional children in the area, but has likewise indicated its ability to step into the situation and make immediate accommodations for them.

"At this point then, it became apparent that Lysite and Riverton were substantially in agreement that Township 33 of School District 40 ought to be annexed to District No. 25. The uranium interests on the other hand called the Commissioners attention to the fact that the entirety of the Gas Hills Area ought to be in one School District, for the reason that it would be unfair for a portion of the area to be taxed at one levy while another would be taxed, by virtue of being within another school district, at a different levy, and upon the initial petition of the Riverton Schools for the annexation of Township 33, the uranium industry appeared in protest, their protest apparently being based upon the above mentioned consideration.

\* \* \* \* \* \*

"We likewise want to call attention to the fact that on a per capita basis the Riverton schools have the least amount of tax dollars available for the education of their children * * *."

McGuire said that the letter expressed the way he felt, that he didn't see how District 40 could take care of the children in Gas Hills; that there was an influx of children into Riverton by reason of the development in the Gas Hills area; that Riverton was educating them; and that he felt District 25 should have the taxes for their education. He admitted, however, that he did not know how many children were there. He said there was no road from the Gas Hills area into Moneta or Jeffrey City.[6]

Clarence Grieve of District 9 said he attended three or four meetings and told of the occurrences on July 2, but he was not questioned as to the occurrences on July 9.

6. Another witness testified there was a road to Jeffrey City.

H. O'Neil Griffen said he was present on July 9; that Mr. Quine of the Lucky Mac said there would be a minimum of fifteen and a maximum of twenty-five children in the area; that there was some question raised about the amount of debt of School District 25, but no other statements regarding the assessed valuation of the various districts. Mr. Griffen was asked:

"* * * Do you remember any person standing up and stating that Riverton would have 170 children from the mining camps against Fremont's total assessed valuation of about 56,000,000; District 25, 14,500,-000, about 25 percent of the total, when the total number of children in the— in District 25 is about 1700, which is about 40 percent of all those being added in Fremont County, Wyoming, and the assessed valuation of District 25 is about 8,500 and the assessed valuation per student for all Fremont County would be about 15,000. Now, do you recall any person making that statement?"

To this he answered, "I believe Mr. Moran elaborated to that in his opening statement." Mr. Griffen also testified:

"Mr. Moran, at the request of Mr. McGuire stated that he reviewed the situation with respect to the meetings of the mining companies, as he put it, he presumed to speak for the mining companies, that they had on, as I recall, two previous occasions with the Board, and at which time they had protested the annexation of any of this area to the Riverton School District that they now—of course at that time he did say they were not considering township 32 north as part of it; but that the mining companies were not (sic) [7] coming before the Commissioners stating that in order to achieve an equitable taxation system for all the mining companies, and since the reserves and production could come from these two townships that the mining companies were coming to join with the School Board of 25 asking that those two townships be put in there. And that is the jest (sic) of what he said."

R. Lauren Moran, the defendant boundary board's only witness, was interrogated and responded at some length regarding the general situation in the area; but his references to what happened at the July 9 meeting were limited to what Mr. Hand had said on behalf of the Globe Mining Company, William Smith's statement that the boundary board should not approach a solution until all of the districting problems of the county could be studied, and his own discussion of the comparative mill levy between Riverton and another district.

There was little attempt made by any of counsel to elicit what had happened at the meeting of July 9 but rather to have the witnesses testify generally as to the situation in the areas concerned. However liberal an interpretation might be given to the minutes of the district boundary board or the testimony of the witnesses who were present at the meeting, it could not be said that there was any clear evidence showing the residence of families with school children in Townships 32 or that any need for schools existed there; and although the evidence regarding the Gas Hills area (Townships 32 and 33) showed the number of school children there, it did not encompass information regarding tax valuation, school census figures, or probability of future needs. In other words, there was no evidence whatever concerning the area which was detached and no comprehensive showing of either the needs or the ability to meet the needs in any of the three areas involved.

Appellees expended much time and effort at the trial in presenting Exhibit B which purported to give data regarding assessed valuations. Such information was, of course, extremely important to the board

---

7. The witness's statement is difficult to reconcile, and there may possibly have been some error of transcription.

prior to its decision, but according to the record no presentation was then made. This lack could not be cured in the district court appeal, and the exhibit should therefore have been excluded.

We are cognizant of the rule that every reasonable presumption should be indulged in favor of validity of a school district which is established pursuant to legislative authority,[8] but there was nothing presented to this court which would show that the Fremont County District Boundary Board had before it at the meeting sufficient information upon which it could reasonably determine that Township 32 should be transferred from District 9 to District 25.

In the light of the philosophy so well expressed in Chicago, B. & Q. R. Co. v. Byron School Dist. No. 1, supra, we cannot say that there was an opportunity for the board to duly consider the welfare and interests of all the people who were concerned. We think that such information is a prerequisite to the action of any administrative board. Accordingly, the judgment of the trial court must be reversed.

Reversed.

8. People ex rel. McLain v. Gardner, 408 Ill. 228, 96 N.E.2d 551.