Raymond Charles JERGESON, Appellant (Plaintiff below),

v.

The BOARD OF TRUSTEES OF SCHOOL DISTRICT NO. 7, SHERIDAN COUNTY, Wyoming (John Burgess, William Carroll, John Dregoiw, Dr. George Ewan and George Gilgorea), Appellee (Defendant below).

No. 3843.

Supreme Court of Wyoming.

Nov. 6, 1970.

John R. Smyth, Cheyenne, for appellant.

Holstedt & Archibald, William K. Archibald, Sheridan, for appellee.

Before GRAY, C. J., and McINTYRE, PARKER and McEWAN, JJ.

Mr. Justice PARKER delivered the opinion of the court.

This is an appeal under the provisions of the Wyoming Administrative Procedure Act, §§ 9–276.19—9–276.33, W.S.1957 (1969 Cum.Supp.), from an order of the district court affirming the dismissal by the Board of Trustees of School District No. 7, Sheridan County, of a high school teacher, Raymond Charles Jergeson. The facts are briefly these. On March 11, 1969, the appellant who had been employed as a teacher in the Sheridan high school during the school year, 1968–1969, signed a contract for the coming year tendered to him by the school board. On May 9, 1969, the president of the board delivered personally to appellant a "Notice of Dismissal" for the reasons that:

"1.  Your philosophy and practice of education is detrimental to the best interests of the high school students.

"2.  Incompetency, as evidenced by the April 1, 1969 edition of the Ocksheperida, the school newspaper of Sheridan High School, for which you are Advisor."

The notice stated that a hearing before the board on the reasons for the dismissal would be held in Sheridan on May 28, 1969, at 7:30 p. m. The hearing was held on the stated date and the proceedings stenographically reported. The board on June 20, 1969, made its findings of fact, conclusions, and order, which stated its determination on various aspects of the hearing; concluded, inter alia, for reasons stated that appellant had failed to teach in a manner satisfactory to the board and had not met or attempted to meet the minimum standards of conduct and propriety for a teacher in the school; and ordered that he be dismissed from his employment, effective June 20, 1969.[1]

Thereafter on July 15, 1969, appellant filed a petition for judicial review, asking the court to reverse the decision of the board concerning his dismissal and to reinstate him as a teacher for the school year 1969–1970. On August 6, 1969, at appellant's instance, the board having filed nothing, the clerk of the district court issued an "Entry of Default," which was later set aside. The petition for review came on for hearing, and the court issued an order affirming the board's action, from which this appeal has been taken.

Appellant challenges the court's affirmance on some thirteen grounds. His first four arguments deal with alleged errors of the district court: (1) in setting aside the default judgment, (2) in not reversing the board's decision in view of its failure to comply with the Wyoming Administrative Procedure Act, (3) in not reversing the board's decision since it had not adopted and filed rules and regulations, and (4) in finding there was substantial evidence to sustain the school board's position that Jergeson was "responsible to censor the newspaper."

His next seven arguments relate to the board. He alleges it gave no notice concerning a poem which appeared on the blackboard of the Ocksheperida room; that its dismissal of Jergeson for the use of the term "rape" was arbitrary, capricious and a violation of his right to due process of law; that it erred in admitting hearsay

1.  Marion Ladd, chairman of the board, was present and testified, but did not participate in the conduct of the hearing or the findings, conclusions, and order.

testimony taken at a previous hearing, in allowing the testimony of a Mr. Skar, and in making a finding as to appearance and dress of Jergeson; that it violated Jergeson's constitutional right to freedom of speech and expression; and that it failed to give him notice of all the charges against him.

Finally appellant argues that the existing method of appeal is either unconstitutional or if not requires a "zealous examination of the whole record by the reviewing authority," and that evidence of acts performed or not performed prior to the time the board offered a new contract was inadmissible. At certain sacrifice of the overall discussion merited by a problem of this nature, we have addressed ourselves separately to each of the thirteen grounds raised by the appeal.

## CHARGED DISTRICT-COURT ERRORS

### *Setting Aside the Default*

■ The contention that the court erred in setting aside what appellant calls a "default judgment" is misconceived. It stems from two unwarranted assumptions, first that there was a default judgment, whereas there was merely an "Entry of Default" by the clerk of court; second, the proceeding in the district court was an "action" covered by the Rules of Civil Procedure, whereas it was a *review* under the provisions of Rule 72.1, W.R.C.P., issued by this court pursuant to § 9–276.32 (b). Reference to Rule 72.1, relating to judicial review of administrative action, discloses no requirement that ipso facto the opposing party is required to answer. From a consideration of both the Wyoming Administrative Procedure Act and the implementing rule, such review is in the nature of an appeal, which requires no answer to be filed.[2]

### *Failure of Board to Comply With Act as to Notice and Rules*

■ Appellant's second and third charges of error relate to the failure of the board to comply with the Wyoming Administrative Procedure Act, hereinafter referred to as the Act; first, as to lack of proper notice of the hearing, and second, as to failure to adopt rules of practice. He observes that, at the time of hearing, objection was made as to the sufficiency of the notice, § 9–276.25 requiring that the "authority" and "jurisdiction" under which the hearing was "to be held" and a statement of the particular "statutes and rules involved" be set out in the notice. He contends such a statement was not in the notice and maintains that the court erred in saying a waiver (which was attached to the notice and cited § 160 of the Wyoming Education Code of 1969—§ 21.1–160, W.S.1957 (1969 Cum.Supp.)—concerning suspension or dismissal of teachers) was "referred to and made a part of the notice proper," arguing that the only reference to the waiver in the notice was, "A waiver form is enclosed," and that unless the "requirements" set out in the notice of hearing conform with the statutory requirements said notice is insufficient.

While we can agree with counsel that the court's saying the waiver was made a part of the notice is not literally true, we think the criticism is over-technical and that in all fairness the notice contained a reference to the statutory authority for its issuance. Moreover, we are inclined to the view that § 9–276.25(b) has been superseded as to notice by the specific provisions of § 21.1–160(a), which circumstance neither of the litigants have discussed. Imlay Township Primary School District No. 5 v. State Board of Education, 359 Mich. 478, 102 N.W.2d 720, 723.

■ As to the failure of the board to adopt rules and regulations required by the Act, this court has frequently called attention to the statutory requirement to

2. The provision in Rule 72.1(c), W.R.C.P., that certain prerogative writs "shall be available by independent action" has no relevancy in this proceeding.

adopt rules and regulations,[3] and it is most unfortunate that various agencies have neglected so to do. Undoubtedly, a court would, upon request by an interested person, direct an agency to comply.

■ Jergeson made a motion before the board that the proceedings be terminated because he was prohibited from having a fair hearing since no appropriate rules and regulations for the conduct of a hearing had been adopted in accordance with § 9–276.20(a) (1). Appellant's motion was general in nature; and while no particular allegations are necessary, the motion was not sufficiently specific to apprise the board wherein he was prejudiced by its failure to adopt rules of practice. Furthermore, he has not cited authority nor made convincing argument here that the nonadoption was fatal. It is conceivable that upon a showing of an agency's failure to adopt rules the agency would be required to assume the burden of showing an appellant not to have been prejudiced. However, where as in this instance a procedure is detailed by the statute the appellant has the duty of pointing out specifically where any disadvantage lies. We recognize that there could exist situations in which a failure to adopt rules of practice would be sufficiently prejudicial so as to constitute a basis for setting aside a decree or order; and if such a predicament is to be avoided, all agencies should immediately adopt rules as the statute contemplates.

### Newspaper

■ We find it somewhat difficult to grasp the purport of this aspect of appellant's argument. He preliminarily states that "The court erred in finding that there was substantial evidence to sustain the school board's position that Jergeson was responsible to censor the newspaper," but while calling attention to the board's finding that the teacher was the faculty adviser of the Ocksheperida does not pinpoint any erroneous "finding" of the court. Appel-

lant maintains that there were no rules and regulations concerning the responsibility for the paper and that without a definite policy concerning the paper the board should not be allowed to dismiss for something Jergeson was not directed to do, but also states that it was Sara York, the editor and author of the questioned article, who was responsible for the newspaper. At one point appellant says that this was the joke edition of the newspaper and that the author testified she thought the disputed article was funny; at another he seems to argue that the editor had a right to criticize, citing Zucker v. Panitz, S.D.N.Y., 299 F.Supp. 102, 105, as explicitly in point when it said:

"This lawsuit arises at a time when many in the educational community oppose the tactics of the young in securing a political voice. It would be both incongruous and dangerous for this court to hold that students who wish to express their views on matters intimately related to them, though traditionally accepted nondisruptive modes of communication, may be precluded from doing so by that same adult community."

While the whole of this argument may well constitute a perfect "shotgun" approach, it presents no valid ground for reversal. In view of the testimony of the school principal that Jergeson conducted a class in journalism and was the adviser to the school newspaper—the two intermingling—and as adviser was responsible for those who work on the paper and the production of the paper, and that of Sara York who said that Jergeson in no way advised her concerning the questioned article in the newspaper and that although she "imagined" he saw it before it was published she did not remember his discussing it with her or giving her any criticism, we consider the trial court's opinion in regard to the newspaper well grounded:

"* * * [Other incidents and] his apparent approval of a picture of a row of

3. Rolfes v. State ex rel. Burt, Wyo., 464 P.2d 531, 532; Scarlett v. Town Council, Town of Jackson, Teton County, Wyo.,

463 P.2d 26, 27–28; Glenn v. Board of County Commissioners, Sheridan County, Wyo., 440 P.2d 1, 3.

urinals in the school newspaper are not exactly fine examples to set for impressionable students. It is not that these students or at least a part of them have not been exposed to a more base and filthy humor outside the schools but in the halls of an institution where lofty ideals and examples should be the rule, it is out of place. The School Board obviously was offended by this conduct which could well be classified as incompetency.

\*     \*     \*     \*     \*     \*

"Tinker vs. De[s]Moines Community School District, [393 U.S. 503, 89 S.Ct. 733] 21 L.Ed.2d 731, is cited by Plaintiff as giving the students the right to express critical opinions of the disciplinary action of certain teachers, in the 'Old Meany Master' article and the Letter to the Editor. One expression in that case strikes the Court as being applicable. At page 741, it is stated that a student may express his opinion if he does so ' "without materially and substantially interfering with appropriate discipline in the operation of the school" and without colliding with the rights of others.' It seems to the Court that the Board of Trustees could have well decided that the mentioned articles appearing in the Ocksheperida did interfere with the discipline of the school and did collide with the rights of others, namely the teachers and administrators of the school, involved in the two matters there discussed. The School Board could have well decided within its discretion that when the faculty member in charge of the Ocksheperida and instructor in journalism permits such articles to appear that he is in this way expressing his incompetence.

"The students in speaking out in the school paper as they did were not entertaining a subject such as the war in Vietnam or some controversial matter of a public nature but were making personal attacks on members of the faculty. There is a regular way to make such complaints and that is to the Principal, the Superintendent or to the Board of Trustees, where these matters may be aired and if necessary a hearing had. It would appear on the face of it that these articles were written in a more serious vein than mere jesting and in a spirit of fun. They were clearly barbed. The school board could well be justified in deciding that this is a demonstration in poor journalism, one of the subjects taught by Mr. Jergeson and another example of his incompetency. The Court would not want to defend the proposition that the board was arbitrary, capricious and unreasonable in doing so.

\*     \*     \*     \*     \*     \*

" \* \* \* [Other incidents and Mr. Jergeson's] failure to adequately supervise a school newspaper with which he was charged may be manifestations of his loose views and the Board of Trustees could well so conclude."

## CLAIMED BOARD ERRORS

### Poem

Appellant argues that his dismissal was discriminatory, a violation of due process for failure to give notice, and was arbitrary and capricious as to any "alleged dirty poem" which a student wrote on a blackboard in his high school classroom, appellant permitting it to remain there for approximately two weeks.

■ On the notice aspect, it is claimed the board should not have accepted testimony about the poem since appellant was given no notice by the school board "concerning testimony." We have heretofore set out the reasons given by the board to Jergeson for his dismissal. While the stated reason that his philosophy and practice of education was detrimental to the best interests of the high school students did not provide a delineation of incidents, it was basis for questioning—especially in the absence of objection—concerning various activities in the school. Additionally, under the Act the discovery procedure provided in the Wyoming Rules of Civil Procedure was available to him.

Appellant's "discriminatory" charge is based upon the fact that another teacher also used the room in which the blackboard and poem were located, no action of dismissal being taken against her. It is, of course, obvious from the record that the school board did not base its action on this single incident but rather investigated various occurrences and circumstances which were considered in the determination of whether or not the teacher met the minimum standards of conduct and propriety. Thus, both the discriminatory charge as well as the claim that the board was arbitrary and capricious are without merit.

### Use of Term "Rape"

Appellant maintains that the alleged use of the term "rape" before a group of high school girls was insufficient ground to deprive a man of his livelihood and that, further, there was no notice that this was a ground upon which the board would rely to dismiss him. For the reasons stated under the preceding point, this did not constitute error.

### Hearsay Testimony

Appellant argues that the board raised a question of his personal beliefs by hearsay evidence as to the use of marijuana and the takeover of school administrative offices for just cause, insisting that a man is entitled to hold any belief he so desires and cannot be condemned nor fired for his personal beliefs. The challenged evidence was the testimony given by the chairman of the board, Marion Ladd, as to statements made by appellant at an executive session of the board in April 1969. Since the witness's testimony did not depend upon the veracity or competency of a person other than himself, we do not view the evidence as hearsay;[4] furthermore, at the time such testimony was adduced, no objection was made on that basis to its introduction.

### Skar's Testimony

The board found that during the school year 1968–1969 appellant invited a local businessman (Edmund Skar) to lecture the journalism class; that while he was lecturing, students arrived late, talked to each other audibly, and some walked out of the classroom; and that appellant, who was present, made no effort to control or discipline the students.

Although appellant asserts that the board erred in allowing Skar's testimony, such position is not made clear. Without argument or presentation of authority, it is merely said that the board waived any wrongdoing during the period of appellant's teaching by offering him a new contract; which statement unsupported as it is, does not merit discussion; and, without basis in the record, appellant assumes this was a laboratory class and that the late students as well as those who left early were most likely working on a laboratory-type assignment, requiring their temporary absence. Again, this allegation of error does not warrant discussion.

### Finding as to Appearance and Dress

It is urged that consistent with Griswold v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, the right to wear a beard and to wear the attire he so chooses as long as it is neat are among rights of privacy flowing from the first eight amendments to the United States Constitution and attention is called to the board's finding:

> "Although, Mr. Jergeson appeared at the hearing in a business suit with his beard and hair trimmed, prior thereto he was seen by members of this Board when his appearance was inappropriate for the teaching profession."

This could not well be a basis for reversal in view of the board's conclusion:

> "His personal appearance did *not* afford grounds for removal. However, his ge.. eral appearance did not set a proper ex-

---

4.  Murdock v. State, Wyo., 351 P.2d 674, 679.

ample for high school students." (Emphasis supplied.)

*Failure to Give Notice of All Charges*

Appellant contends that failure of the school board to give him notice that he would have to defend against the allegations of Skar as to his ability as a teacher; to defend against a charge that he permitted a poem to be placed upon the board; that he used the term "rape" before a number of girls to try and keep them quiet; and failure to wear his hair, beard and clothes the way the board wanted, constituted a violation of his right to notice as required by the Act and of due process of law. In view of our previous remarks, no further discussion would now appear warranted. However, we might refer to appellant's observation that the need to preserve academic freedom from the chilling effect that necessarily attends the dismissal of a teacher without justification and in violation of his constitutional rights has been zealously protected by the Supreme Court and by lower Federal courts who have similarly acted vigorously to protect school teachers. With this we are in full agreement but do not see any violation of appellant's constitutional rights in the instant case nor lack of justification for the dismissal. We have given careful consideration to the case of Parducci v. Rutland, M.D.Ala., 316 F.Supp. 352, submitted by appellant following the argument herein, but are unable to agree that such case is "right in point." It deals with a situation where plaintiff was conceded by the parties to be a good teacher save for one incident (completely unrelated to any criticism the board had of appellant's conduct here), while in the present controversy a number of matters were reviewed by the board and held to be conduct below the requisite minimum standards of a high school teacher in the institution. Academic freedom must be viewed as an interest of all society, but this does not mean that improper conduct can be condoned under the guise of such freedom.

In Tracy v. School Dist. No. 22, Sheridan County, Wyo., 70 Wyo. 1, 243 P.2d 932, 937 (rehearing denied 70 Wyo. 22, 247 P.2d 153), we held that a teacher agrees by necessary implication that while he continues in his employment his moral conduct shall be in all respects exemplary and beyond just reproach; that entrusted as the teacher is with the education of the young, it becomes of primary importance that the principles of right living be by him instilled into them by his example and by his conduct.

## FINAL ARGUMENTS

Appellant argues that the existing method of appeal is either unconstitutional or if it is not a "zealous examination of the whole record by the reviewing authority" is requisite, and that evidence of acts performed or not performed prior to the time the board offered a new contract was inadmissible. No detailed analysis of these final points is merited. Appellant presents neither cogent argument nor authority on his position that if the board failed to inquire into the conduct of Jergeson prior to March 11, 1969, when it offered Jergeson a contract, it waived any such alleged misconduct and was precluded and estopped from raising such issues at a later date, and that claim will not be considered. School District No. 9, County of Fremont v. District Boundary Board In and For Fremont County, Wyo., 351 P.2d 106, 109. As to appellant's point that the method of appeal is unconstitutional if it does not require a "zealous" examination of the whole record, his thesis is premised on the claim that where there is a clear abuse of the rights of public employees, this court must overrule the administrative tribunals. However, he has shown no such abuse of his rights. The board after a hearing made various findings indicating a departure by appellant from standards which we have heretofore indicated to be proper. The district court, carefully reviewing the evidence and hearing argument, determined there was no ground for reversal, and nothing has been

here presented which convinces us of existing error.

Affirmed.

GRAY, Chief Justice (dissenting).

I am not greatly disturbed with the result reached by the majority for the reason that it is not particularly significant from a practical standpoint. Despite the conclusion of the board that plaintiff did not meet "minimum standards of judgment, decency and decorum which a teacher in this district should observe" and the order of dismissal, the record discloses that plaintiff soon thereafter was offered and accepted employment in the school system of Burns, Oregon. The blight cast by the proceeding upon the academic record of the plaintiff, however, is a matter that merits consideration and my disagreement with the majority stems from that and what the opinion portends in a matter of great concern to the public, to the boards, and to the teaching profession. I cannot help but feel that the rationale and philosophy underlying the memorandum opinion of the trial court and of the majority leads to a result contrary to the intent and purpose of the Administrative Procedure Act and the Wyoming Education Code of 1969, which are designed to prevent the exercise of uncontrolled discretion by school boards in the firing of teachers. If a teacher can be discharged for incompetency on the basis of the record before us in this case, it is quite apparent that a school board would have little difficulty in dismissing a teacher who for flimsy reasons had incurred the ill will of the board.

In this connection I am not unmindful of or opposed to the doctrine of abstention by the courts from interfering with school boards in affairs of this kind. Today, however, in the light of the A.P.A. and the school code, which I have mentioned, and fairly recent decisions particularly of the Federal courts dealing with due process, with academic freedom, with the right of free speech, and the Civil Rights Act, we have an entirely new "ball game" and these problems must be approached accordingly.

I am appreciative also of the fact that the record before us leaves much to be desired as a basis for considering in depth the questions presented. In the hearing before the board, point after point is meagerly or wholly undeveloped by the evidence and the presentation here also leaves much to be desired. Nevertheless, contrary to the majority view, I think it sufficient to raise grave questions and we are not relieved from making a careful review and analysis of the whole of the record to determine whether the action of the board was violative of administrative due process, was arbitrary and capricious, and was unsupported by substantial evidence as charged by plaintiff. My analysis of the record and the law applicable thereto persuades me that plaintiff's contentions in several respects are sound and should be sustained.

With respect to due process insofar as it relates to the failure of the board to adopt rules of practice and procedure, I agree with the general discussion and holding of the majority. With respect to lack of proper notice by the board, I also agree that there is no cause for reversal here inasmuch as the record shows that the evidence of both parties relating to what the parties deemed to be the issues raised by the notice came in without objection on the basis of the inadequacy of the notice. Nevertheless, I think the matter merits some comment. It cannot be overlooked that this is a penal proceeding. At the time the board served its notice it was well aware of the detail of the matters upon which it was going to rely as constituting grounds for plaintiff's dismissal. Under those circumstances § 9–276.25(b) (4) of the A.P.A., W.S.1957, 1969 Cum.Supp., provides that the notice must "state the matters in detail" and certainly the "shotgun" charge of paragraph 1 of the notice is not only in direct violation of that provision but to me reflects unfairness on the part of the board inasmuch as it was the accuser and plaintiff was afforded very little time within which to prepare his defense. Even after hearing and issuance of the board's order, we are not told which of the general standards

prescribed by § 21.1–160 of the code, W.S. 1957, 1969 Cum.Supp., plaintiff was charged with violating. The standard adopted by the board and quoted above is not a statutory standard but inasmuch as the trial court and the majority have treated it as falling within the standard of "incompetence" as a teacher, I shall do the same.

Another phase of the matter which I think merits further comment in addition to what I have aready said is plaintiff's contention that we must at least under the circumstances of this case make a "zealous examination of the whole record" in order to protect the fundamental rights of the plaintiff. Whether it should be a "zealous" or a "careful" review as I have said is not important. It must in any event be adequate.

Ordinarily when agency action is before the trial court or this court for review it involves a decision in a proceeding initiated and submitted to the agency by private parties. There are, however, cases coming before us when that is not true and this case illustrates the exception. Here the board, acting upon its own rather than through the superintendent or a member thereof as contemplated by § 21.1–160(a) of the code, placed itself in the unenviable position of being the accuser, the prosecutor, and the judge of the merits of its own charges. I do not say that this, standing alone, is violative of the due process clause of the Federal constitution and of this state inasmuch as it has often been condoned, primarily on the ground of necessity, which incidentally is not present here inasmuch as § 21.1–15 of the code furnishes a forum whereby local boards having grievances with a teacher over competency, for example, can have the controversy heard and determined by the State Board of Education. In pointing this out, however, I want it to be understood that I am not impuning the integrity, good intentions, and sincerity of purpose of the members of local boards when placed in this dual position, which could hardly be of their own choosing but nevertheless forced upon them by the legislature. I am simply pointing out that inherent in the requirement for a hearing is the need for impartiality and an objective analysis and "consideration of the whole record," which § 9–276.26(a), W.S. 1957, 1969 Cum.Supp., in fact requires on the part of the local boards; and it is for us, as I stated above, to see to it that these safeguards are observed.

Otherwise the hearing might well represent a mere formality looking toward a predetermined and desired result by the trier of the facts bringing discredit to the courts and to the administrative process. As indicated in the footnote of the recent case of Pickering v. Board of Education of Township High School District 205, Will County, Illinois, 391 U.S. 563, 88 S.Ct. 1731, 1740, 20 L.Ed.2d 811, it will not do simply to search the record for bits and pieces of evidence that lend support to a decision rendered under such circumstances. That is my approach here, and I think I can demonstrate wherein the board here did not act impartially, was arbitrary and capricious, and in several instances based its conclusions on findings of fact contrary to or unsupported by the evidence which entered into its conclusions.

In doing so I do not overlook the fact and can understand that the difficulties plaintiff had with the board and its members were mostly of his own making in that he had apparently incurred the ire of the board members by flaunting before them a style of hair, a beard, and dress of which they disapproved, and at their invitation and in a conference called by them on April 6, 1969 for an interview concerning his philosophy of education, his justification of the articles appearing in the April 1, 1969 issue of the school paper, and other matters, made known his views on legalization of marijuana and student sit-ins, which were as abhorrent to the board as they would be to the great majority of adult Wyomingites. As judges, however, we know and the board knew, as reflected by its order, that this alone would not justify dismissal. I shall discuss this more fully in connection with the board's findings and conclusions.

Reverting for the moment to the matter of impartiality, I would point out also that the board had an "ax to grind" in this proceeding. At the time the board had its interview with plaintiff it had already entered into a contract with plaintiff dated March 11, 1969 for the ensuing school year 1969–70. As matters developed on or about April 6, 1969—the date of the interview—it is only reasonable to suppose that the board under the circumstances was desirous of getting out from under the renewal contract. In order to accomplish its purpose, it set in motion the within proceeding by serving upon plaintiff on April 9, 1969 its notice of dismissal "effective at the end of the current semester," which as the board concedes was on or about May 31, 1969, the time when the 1968–69 contract expired. By that time, of course, the contract would have been fully performed by both parties. The only thing to be gained by the board was indirect relief from its renewal contract, which apparently has been accomplished. In this connection it will be of interest to note the board's finding XIII, reading as follows:

> "That the Board takes notice of the fact that before the 1969–1970 contract was executed by Raymond Charles Jergeson the Board suggested to the teacher that he not execute the contract and that he seek other employment for the coming year."

The record does not disclose, in keeping with the provisions of § 9–276.26(d), W.S. 1957, 1969 Cum.Supp., that plaintiff was ever notified the board would take notice of such fact and the board introduced no evidence to show that plaintiff was ever told not to sign the contract. Nonetheless, the inclusion of that language in its order would indicate that it was taken into consideration in the board's action. In this connection I would point out that the burden under the code was on the board to establish by the record justification for the action it took and one of the most difficult problems the board had to face in the light of the foregoing was the fact, as we well know, that the superintendent had prior to the renewal recommended the renewal of plaintiff's contract, which in itself is rather persuasive evidence that plaintiff was not an incompetent teacher. Also, it is worthy of note that the board did not call the superintendent or the principal, plaintiff's immediate superiors, to testify at the hearing on the basic issue of incompetence.

Further, in discussing the incidents upon which the board relies, it should be noted that general reference has been made to plaintiff's asserted violation of minimum standards of conduct and propriety as a teacher. Other than the general statutory standard, the only prescribed standard in this case is that contained in the printed form of the board's contract, reading as follows:

> "Recognizing that teaching is a profession, desiring to assist in the elevation of the teaching profession, and to conduct myself in a completely professional manner, I promise that I will honor the letter and spirit of this contract to the fullest of my ability."

Granted, a teacher as a part of his training should be versed in a general way with the need for and the reach of those general standards. One of the difficulties here, however, is that the board produced no direct evidence by a professional as to acceptable minimum conduct under such standard and prior to this proceeding at least had adopted no rule or policy augmenting such standard as to minimum conduct that would be acceptable to the board. Thus the plaintiff, about which he complains and rightfully so, and the trial court and this court were left to speculate as to just what minimum performance the board expected of its teachers.

## THE NEWSPAPER

For convenience there is appended hereto a copy of the article entitled "Meany Master." It is undisputed that plaintiff was the adviser of the newspaper, but the president of the board testified that the superintendent and principal also had re-

sponsibilities in connection with the newspaper. It is likewise undisputed that it was an "April Fool Edition" of the paper and it is clear from the president's testimony that the board had discussed the edition with plaintiff prior to hearing and had concluded that the items in question were not humorous. Also, that it was directed toward the sponsor in charge of the school activity. It is also undisputed that the board had no standards, rules or regulations as to what the responsibilities of the adviser, the principal, and superintendent were with respect to what should or should not be published in the paper.

With respect to these matters, the board found "That the writing wrongly characterized the faculty member as being oppressive, devious and a person of low intelligence" and that said issue of the newspaper was "offensive to some students, faculty members and parents of students." In its general discussion it said that the issue "is evidence of a permissive attitude in the classroom which is not in the best interest of the students. The 'Meany Master' story sharply attacks a member of the high school faculty. In our opinion this undermines respect for the teacher involved and to some extent for the faculty as a whole." It then went on to say that it was not greatly concerned with the picture except that it reflected an attitude of permissiveness. The majority has seen fit to resolve this question on the basis of the trial court's opinion, and while I agree that the student author's freedom of expression is "subject to reasonable restrictions as to time, place, manner and duration" of making, Sullivan v. Houston Independent School District, S.D.Tex., 307 F.Supp. 1328, 1339, and as indicated in Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, 739, it must not materially and substantially interfere with appropriate discipline in the operation of the school and must not collide with the rights of others, I would point out that the board's finding set out above that the issue was offensive to some students and to parents of students is not sup-

ported by substantial evidence. No student or parent so testified. The only faculty member who testified with respect to it was the sponsor who said that her reaction was one of "shock and disgust," and while it "shook" her up temporarily she recovered by the next day and her teaching ability was not affected. She also testified:

"Q. Well, tell me what's true in the article first? A. I know nothing is exactly true. It isn't really false, it's exaggerated, out of proportion. Some of the statements are false. It's hard to say anything is really true.

"Q. But it intimates what actually happened? A. Yes, it does."

I would also point out that there is no evidence that the issue of this newspaper caused any disruption in the discipline and operation of the schools and certainly the fact that the board was "offended" and did not regard the article as humorous and felt that it constituted "a demonstration in poor journalism," of which there is likewise no evidence, represents no standard by which plaintiff's competence as a teacher could be judged. The fact remains that plaintiff, the only expert on journalism, did by his approval regard the article as humorous and as good journalism. What the board actually did was to determine that the "Meany Master" article per se was detrimental to the school, but as stated in Pickering, supra, 88 S.Ct. at 1736:

"However, the only way in which the Board could conclude, absent any evidence of the actual effect of the letter, that the statements contained therein were *per se* detrimental to the interest of the schools was to equate the Board members' own interests with that of the schools. Certainly an accusation that too much money is being spent on athletics by the administrators of the school system (which is precisely the import of that portion of appellant's letter containing the statements that we have found to be false, see Appendix, infra) cannot reasonably be regarded as *per se* detrimental to the district's schools. Such an accusation reflects rather a difference of opin-

ion between Pickering and the Board as to the preferable manner of operating the school system, a difference of opinion that clearly concerns an issue of general public interest."

With respect to the restrictions noted above on the staff member's right to author and have published the "Meany Master" article, the principal of the high school said that the purpose of the student newspaper "first of all, is to instruct students in writing journalistic writing and putting together a newspaper. Secondly, it's to serve as communication between students, between faculty and students, between students and faculty, to inform the school community about events, and to bring up matters of school interest and school concern." To say that the article did not fall within that general purpose is wholly unreasonable.

It is true, of course, that she was not speaking out on the Vietnam war but she was speaking out on a matter of concern to the girls participating in a school activity which in their young lives was an important, enjoyable and integral part of school life. The whole thrust of the article was to protest what the author regarded as a chilling effect upon those activities by the sponsor's imposition of arbitrary rules of her own making and her refusal to listen and consider the girls' complaints. True, the article was "barbed" but when measured by the view taken by the court with respect to the "Grass High" article appearing in Scoville v. Board of Education of Joliet Township High School District 204, County of Will, State of Illinois, 7 Cir., 425 F.2d 10, 15–16, and the view of the court concerning an article entitled "Edmund's Thoughts" and "School Spirit vs. Conscience" in Sullivan v. Houston Independent School District, S.D.Tex., 307 F.Supp. 1328, 1348, which went far beyond being "barbed" and far exceeded the manner of criticism employed here, it is clear that the board erred in reaching its conclusion on a per se basis.

Accordingly, it seems to me that before plaintiff could be penalized for failing to prevent the publication of the article in the school paper the school board would first have to justify an invasion of the author's right through the medium of the plaintiff, Scoville v. Board of Education of Joliet Township High School District 204, County of Will, State of Illinois, supra, 425 F.2d at 13. It has not done so, and to equate plaintiff's refusal to prevent publication as evidence of "incompetence" as a teacher is unreasonable and unwarranted as disclosed by the quote from the Zucker case in the majority opinion.

With respect to the picture of the urinals, I would not quarrel with those who considered it out of place in a student newspaper. It seems to me, however, that this might well have been prevented by the adoption of a rule preventing such a happening, which the board is apparently now doing, as there were and are bound to be different opinions in such matters. In any event the picture lends little support to the harsh remedy the board imposed.

POEM

Other than to point out that the poem was not placed on "a blackboard in Mr. Jergeson's classroom" as the board found but was placed on the bulletin board in the "Ock" room where the students on the staff of the school paper went to get their assignments and put the school paper together, it seems to me the significance of this incident was built up by the board out of all proportion to its importance on the basic issue of plaintiff's competence and lends little if any support to the board's order.

USE OF TERM "RAPE"

Here again I think this incident was built up out of all proportion to its significance. According to the young lady who testified concerning the matter, there was no reaction from the ten or fifteen girls in the class. I would agree, however, that plaintiff's choice of the word to lend emphasis to the need for discipline in the halls of the high school was tasteless and extreme. That the incident verges on interference with academic freedom as viewed by the

Federal courts, however, is well demonstrated by Keefe v. Geanakos, 1 Cir., 418 F.2d 359, where a word much more shocking than the word used here was contained in a reading assignment in an English class and the court nevertheless held that the firing of the teacher for making the assignment was erroneous. The court had this to say, 418 F.2d at 361–362:

> "Hence the question in this case is whether a teacher may, for demonstrated educational purposes, quote a 'dirty' word currently used in order to give special offense, or whether the shock is too great for high school seniors to stand. If the answer were that the students must be protected from such exposure, we would fear for their future. We do not question the good faith of the defendants in believing that some parents have been offended. With the greatest of respect to such parents, their sensibilities are not the full measure of what is proper education.

> "We of course agree with defendants that what is to be said or read to students is not to be determined by obscenity standards for adult consumption. Ginsberg v. New York, 1968, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195. At the same time, the issue must be one of degree. A high school senior is not devoid of all discrimination or resistance. Furthermore, as in all other instances, the offensiveness of language and the particular propriety or impropriety is dependent on the circumstances of the utterance."

Also, I do not agree that the Parducci case cited by the majority does not bear upon this question even though not "right in point." It contains an informative and well supported discourse upon this subject and while it is true that the board did not concede that plaintiff was a "good teacher" there is no basis in the record, as I have pointed out, for drawing an inference to the contrary.

In this connection it is of interest to observe that while the board objects here to the method employed by plaintiff to maintain discipline, it took special note by its finding X based upon the testimony of Edmund Skar with respect to another isolated incident that plaintiff "made no effort to control or discipline the students" in Skar's presence. Again I would point out that neither of his superiors, so far as the record shows, ever reprimanded plaintiff for his lack of discipline.

## HEARSAY TESTIMONY

I agree that plaintiff's objection to this testimony on the basis of hearsay was not well taken. I do not agree, however, that this disposes of all of plaintiff's contentions directed at this testimony. In addition, this testimony demonstrates rather clearly that the board did not act impartially in the discharge of its function as trier of the facts. It is true that by its order, which obviously was skillfully drawn by its attorney, the board recognizes the right of plaintiff to his beliefs and philosophy but by other language then proceeds to chill that right on the ground that plaintiff "conveyed" and expressed his beliefs and philosophy to the students in his classroom. That these matters weighed heavily with the board is disclosed by its findings and conclusions. The board made these findings:

> "VIII

> "That in April, 1969, the said teacher stated to a member of the Board that in the opinion of the teacher, the use of marijuana is a matter of individual choice, suggesting that in the opinion of the teacher that those who so desire may use or possess the narcotic drug. Student evaluation sheets show that this opinion of the teacher has been conveyed to his students. One student wrote: 'He seems to feel the smoking of pot is Ok. * * *' At the hearing the teacher did not deny or qualify these statements.

> "IX

> "That in April, 1969, the said teacher stated to a member of the Board an

opinion relating to high school student protest, to the effect that students may justifiably occupy the administration offices. That the teacher did not deny or qualify these statements. The students evaluation sheets show that this philosophy was conveyed to the students."

It concluded:

"We have carefully reviewed the student evaluation sheets which were offered in evidence by Mr. Jergeson. We have particularly noted the references to narcotics. Many of these evaluations state that Mr. Jergeson was a stimulating instructor. They show that he influenced youngsters in his classes. The comments affirm his opinions regarding protest. Some of the comments are as follows: 'Mr. Jergeson is basically anti-establishment.' Another student reported: 'He also has some rather weird ideas that I had credited to "hippies" * * *' One student observed: 'He realizes what a mess Sheridan High is, * * *' In answering a question if the teacher promoted activities which parents feel are objectionable, the student answered: 'The way which he continually tries to tear down society and the people that live with it. He downgrades many of the people's actions that perform a function in society.' Another student said, 'I feel he has prompted some kids to be unpatriotic to their parents, school and country.'

"We do not place controlling weight upon the student evaluation sheets. We recognize that a student may unfairly criticize an instructor on such a questionnaire; however, they simply show that his opinions regarding student protest and narcotics were carried into the classroom, and in our opinion tend to produce unwholesome results. Challenging the fundamental values of society is perhaps normal for high school youngsters and some young teachers. This is recognized by the Board. However, the opinion, when expressed in the classroom that the use and possession of marijuana is a matter for the individual to decide, will not be condoned in this district. Mr. Jergeson's challenge of fundamental values shows a lack of propriety which, when considered with the other evidence, requires his dismissal."

If its findings and conclusions were sufficiently supported by the record, I would heartily agree with the board that the plaintiff's dismissal on that ground alone would not only have been justified but would have been demanded. The time and place of the voicing of his philosophy under such circumstances would be inappropriate and not privileged. The difficulty with the findings and conclusions, however, as plaintiff points out, is that they are not so supported. The trial court so determined, with which I agree, and in its memorandum opinion stated:

"This Court does not think there is proper proof that Jergeson expressed his views of marijuana and student take over of the school in class."

The only testimony presented at the hearing bearing upon plaintiff's expressing his philosophy to the students on student protest was that of Hardy Tate who attended four classes taught by plaintiff during the previous school year. On direct the student, in answer to a question on plaintiff's "teaching techniques," testified that plaintiff stimulated discussion and argument and caused students to think. On cross by the attorney for the board he was then asked the following question:

"Did Mr. Jergeson ever state in a class that you were in that students should have the right to go into the Superintendent's office of the Administration office and protest if they felt they had a just cause to do so?"

and answered:

"I don't remember any instances like that, not in my classes."

With respect to marijuana, the board relied solely on the statement of one student given in an answer to a question in a student survey made by the principal which

asked "Does he promote activities or behavior that you feel are questionable?" and to which the student replied that plaintiff "seems to feel the smoking of pot is Ok." This same student, however, prefaced that remark with the statement that although plaintiff is a "liberal," he "says or does nothing to change anyone's ideas greatly." In addition the board selected and emphasized other answers from the survey such as plaintiff was "basically anti-establishment"; had "rather weird ideas that I had credited to 'hippies'"; "continually tries to tear down society"; and lastly a feeling of one student that plaintiff had "prompted some kids to be unpatriotic."

These statements, of course, represent only the results of a survey but inasmuch as the board placed great reliance on this survey in support of its charge that plaintiff's "philosophy and practice of education" was "detrimental" to the best interests "of his students" I think it would be informative and beneficial to show the results of that survey.

Thirty of plaintiff's students had been selected at random by the principal to participate in the survey and were asked to write "an anonymous evaluation of his effectiveness as a teacher," which was the first proposition propounded. The rating was to be made on the basis of "very poor," "poor," "average," "good," and "very good." Of the 30 students, 14 rated plaintiff "very good," 10 rated him as "good," 3 rated him as "average," and 3 rated him as "poor." None rated him as "very poor."

By way of summary of the comments of the 24 students rating plaintiff as "good" or "very good," it was said that plaintiff's teaching was stimulating; that he forced students to think; that he listened objectively to the students; that he taught them to be tolerant of those who disagreed with their own thinking; that he held their interest with timely and thought-provoking material; that students could express themselves in his class "without being threatened by the almighty grade if you disagree"; and that he communicated with the students and he inspired study. The comments of the six students rating plaintiff as "average" or "poor" were those emphasized by the board.

It is also appropriate to point out here that in addition to the survey plaintiff also called three of his students at the hearing who testified that plaintiff was an excellent teacher, and three of his fellow instructors who also testified in his behalf regarded him as a good teacher. Such testimony, however, even though uncontradicted was brushed aside without comment by the board in favor of the conclusions expressed by the six students in the survey. It is also worthy of note that the board produced no testimony by a student or by a professional on the basic issue of plaintiff's competence and quite noticeably failed to call plaintiff's immediate superiors, the principal and superintendent of the high school, to testify as to their evaluation of plaintiff's competence as a teacher. The only inference that could be drawn on that state of the record was that plaintiff was a good teacher and the board so recognized. Noticeable also is the fact that, so far as this record shows, plaintiff's competence as a teacher had never been questioned until the time he was called before the board to answer for his conduct.

Returning again to the survey, the next question propounded was "Has his influence on your thinking and behavior been a wholesome one?" Of those answering the question, 19 students answered "Yes"; 5 answered "No"; 6 answered "Don't know." The students then were asked "Has his influence on the thinking and behavior of other students been a wholesome one?" To this question 6 answered "Yes"; 3 answered "No"; and 15 answered "Don't know." The third question was "Does he promote activities or behavior that you feel are questionable?" With respect to this 14 students answered "No"; 7 answered "Yes"; and 5 answered "Don't know."

The board in its analysis of the results of the survey apparently took the answer of the 19 students voting "Yes" on the ques-

tion of plaintiff's "influence" on their thinking as support for its conclusion that plaintiff was influencing the students to accept his beliefs when the fact is that the greater majority of those 19 stated that his "influence" was positive and beneficial. Even the students making the remarks emphasized by the board stated or indicated that it was only the other students and not they who were being influenced to their detriment.

The foregoing demonstrates to me at least that the board made no fair or reasonable analysis of the portion of the record on this phase of the proceeding, and yet it is obvious from its findings and conclusions that its order of dismissal was predicated in a large measure upon the matter under discussion. I would hold on this ground alone that the plaintiff was prejudiced by the arbitrary and capricious action of the board and its order must be reversed.

## APPEARANCE AND DRESS

Whether or not this incident formed a basis for reversal is not too important in view of the other prejudicial errors I have already discussed. It does, however, have significance with respect to similar future proceedings and for that reason merits some discussion. Wholly aside from plaintiff's argument on the constitutional right of a teacher to privacy, plaintiff demonstrates from the record that the board was clearly in error in injecting this matter into the proceeding.

What the board did here in substance was to take judicial notice without so advising plaintiff of the observations made by its members of plaintiff's appearance on occasions prior to the hearing which, of course, in the first instance was violative of § 9–276.26(d) of the A.P.A. More importantly, the board introduced no evidence at the hearing as to when and where these observations were made and what plaintiff's appearance was at those times. From the record it appears that the superintendent, the principal, and members of

the board knew of plaintiff's manner of wearing his hair, beard and dress prior to the renewal of his contract and yet it is apparent that none of them regarded it at that time as "inappropriate for the teaching profession."

For purposes here I think there is no need to explore plaintiff's contention on his asserted deprivation of his protected right of privacy. His other contentions are sufficient to dispose of this matter, and when that is apparent we ordinarily refrain from deciding such questions. Plaintiff's other contentions are that he had no notice either before or at the hearing that these matters were going to be inquired into; that he was afforded no opportunity to defend against such charges; that the finding is not supported by evidence; and that the board had adopted no rules or policy establishing standards which the board found and concluded were violated by the plaintiff. All of these contentions, as shown above, were amply sustained by the record. In my view the plaintiff here again was not afforded due process.

While the board states in its order that plaintiff's appearance "did not afford grounds for removal" it did not conclude and cannot say in the face of its order as a whole and its injection of this matter under the circumstances described that it gave no consideration to his appearance in reaching its ultimate conclusion that plaintiff was an incompetent teacher. As I mentioned above, the board went out of its way to place emphasis on statements made by students in his survey, such as plaintiff was a hippie type, anti-establishment, and unpatriotic. No doubt it felt, which is understandable, that plaintiff's appearance was an additional thread with which "to sew the garment" of incompetency on the plaintiff as it is regarded by most as the flaunting of an emblem depicting such things. Nevertheless, if the board had a basis for charging that plaintiff's appearance was "inappropriate for the teaching profession" and "did not set a proper example for high school students," there was

a proper way for it to proceed and it has not done so.

CONCLUSION

From the foregoing it is apparent to me that the trial court was in error in confirming the action of the board. I would reverse the trial court's order with instructions to remand it to the board with a direction to expunge from its records the blight cast upon plaintiff's competency as a teacher, which would for all practical purposes put the matter to rest.

APPENDIX

FACING NUMBER ONE
MEANY MASTER
the Crazy ladies

by Sara York, alias sy, alias Samantha Dain.

The OCK, April 1, 1969, p. 8

Once upon a time in the land of Pep there lived eight innocent Patriots and their 35 Followers. These lovely people had promoted patriotism through out the land for many years successfully. All across the land the villagers knew the names of these eight leaders, Lechar, Nalo, Atina, Enij, Anit, Lunev, Neran and Neren, and when the Patriots came to town the townspeople rejoiced and cheered their appearance.

Then, horror of all horrors, one year the Plague hit in the form of a mean master over the Eight Patriots. The Eight Patriots were crippled and nearly destroyed by the Meany Master, who thought her ways were but fair. At each rally throughout the year, the Patriots, not their usual selves, cried and wept as the Meany Master shot 'em down. The Eight Patriots became weak and pale and definitely downcast. Finally, after numerous tortures, Lynev was removed from the Group for a weekend. Being terribly loyal, Lynev managed to attend the rally that weekend. The Meany Master glared at her during the entire rally, while Lynev smiled and tried to be as inspiring as possible.

The next day Lynev begged for Meany Master's forgiveness, pleading, "Oh, Meany Master, let me again join the Eight Patriots for they are my Friends and my whole life. I enjoy so much agitating the crowds each weekend. It is my duty, my pledge. Oh, please, Meany Master, may I return?"

"We'll talk about it," the Meany Master replied calmly.

The 35 Followers of the Patriots were also being abused during this time of unrest. Their bus was taken away only to be used for short trips to relatively unimportant areas. Meany Master did offer an excuse however, "I don't got time to go with yer, yer little jerks."

The 35 Followers cried and cried as *they* were shot down time after time, but still Meany Master persisted her tormentation.

Soon it became evident that Meany Master was of below average intelligence. Her vocabulary consisted of 2 sentences, "We'll

talk about it," which never seemed to happen somehow, maybe because "I don't have time" got in the way. The Eight Patriots began devoting more and more of their precious time conspiring against Meany Master instead of practising their agitation schemes, which is really what they should have been doing. They beban calling peace talks in hopes of breaking down Meany Master's Evil Rules.

(Note: Evil Rules. Definition rules which were set up by the Meany Master as the Supreme Law of the Land for the preservation of power by the Meany Master, and endorsed by Meany Master on her Finger of Fate, which i may condescend to add was Fickle.)

The negotiations began peacefully enough; Meany Master always refused to come, retorting "I don't got time!" Finally, after much deliberation, Meany Master consented to "talk it over." The date was set and the Eight Patriots and 35 Followers felt they were finally making progress.

At the first peace talk, the Eight Patriots were shocked out of their ever-lovin' uniforms. Meany Master, instead of realizing the foolishness and unnecessity of the Evil Rules added a few choice gems to the ever growing, ever constant list.

Number (1): Thou, that is, the Eight Patriots, shall not attend any rally in the land of Pep with unshined saddle shoes on their feet. Note also that Thou shall always be in attendance with saddle shoes on the feet.

Number (2): Thou, that is the Eight Patriots will not make substitutions if Thou plans to be gone without the permission of Goddess, i. e. Meany Master.

Number (3): The Eight Patriot Squad will not be seen in public at rallies with slacks, i. e. levis, pants covering their bodies. Even if the temperature be -100°F, breaking of the Rule will not be tolerated.

Naturally, the Eight Patriots were extremely disappointed. All their weeks of plotting, and planning were now destroyed by Meany Master. Was there to be no escape from this endless torture?

The Ray of Hope came in March—District Rally. At District Rally the Patriots and Followers from all over Pep gathered to campaign and shout for a weekend. The Eight Patriots were elated by the news that Meany Master had consented to let them take the Followers to this glorious adventure. Preparations were immediately begun, and the Eight Patriots again sang their song in tune "Oh, S-H-E-R-I-D-A-N, Sheridan all the time!" Cheerily, the Followers busies themselves with agitation routines to aid the Eight Patriots in their quest of fantastic showings. Reservations for housing were made in a lovely cottage, protected by flowing willows and climbing ivy.

A slight bomb dropped as Meany Master, (now referred to as Not-so-Meany Master), announced the Followers would have to fork over 175 dollars for the chaperones. Naturally, an outrageous price for 4 people, but the Followers were eternally grateful that they could attend District Rally and suppressed any pangs they felt as they dug up the hard earned bread.

Still progress on District Rally continued at an amazing pace. The Eight Patriots kept their rosy red cheeks and bouncy appearances. The Followers wrote new songs like, "Mighty, we are mighty great!" and "Sock it to 'em!"

No on even considered the Evil Rules. They were assumed to have been removed. Unfortunately, the Meany Master had mimeographed them on long, long sheets of paper and titled them "THE SIX COMMANDMENTS". Adding to the collection some which were even more horrible than the Patriots could imagine in their wildest nightmares, the Meany Master passed them out one day at the Follower Enthusiasm meeting. "Here, yer little jerks," the Meany Master began. The whole group was shocked—Meany Master was learning some new words!! "I have typed up the

Rules for you which you must obey at District Rally. Merry Adolf Hitler's Birthday!"

The Evil Rules were passed around and the Faces of the Followers grew longer and longer as the recorder read each terrifying commandment:

1) Thou shall not ride in autos, that is automated vehicles whither they be golf carts or cars.

2) Thou shall not socialize, i. e. be in the rooms of other Patriots and Followers.

3) Thou shall not be seen in public with slacks, i. e., levis, pants covering the bods. Even if the temperature reach -100 F the breaking of this rule shall not be tolerated.

4) Thou shall wear *only* the official uniform of the Sheridan Patriots and Followers while in public, i. e. all the time.

5) Thou shall wear only saddle shoes, i. e. brown and white on your feet. Said saddle shoe footwear will be shined and will look decent, i. e. new.

6) Any infraction of any of these Rules will result in the criminal being sent home."

With tears in their eyes, the Eight Patriots and Followers dragged themselves to their respective homes. "Good Grief," the Followers began to say. "Good Grief, Good Grief . . ."

But, the Eight Patriots were trying their best to be cheerful. Lechar began the coaxing, "Oh, come on. Followers. Be ye cheery. We will triumph at the rallies. We're Number One!"

"Yes, Yes," the Followers yelled and began to chant, "We are Number One, we're number one. . . ."

So plans continued and the Eight Patriots, Followers, and Meany Master travelled to District Rally singing songs of cheer, "Sheridan's gonna beat ya, oh yea. . . ."

Once at District Rally, Evil Rules Infractions began but suprisingly not by the Patriots or Followers; rather by Meany Master. Meany Master rode in cars, Meany Master socialized, Meany Master wore pants. When asked about Meany Master's delinquency, she was rumored to have answered, "I didn't sign those rules, yer can't do nothing to me."

One cold day, i. e. -100 F, when Sheridan had an evening rally, Lechar, Atina, and Nalo went to view the town but ah, for freezing their behinds off, did not wear their micro-short skirts and sweaters, i. e. their uniforms, rather they ware the sinful levis. . OH HORRORS, DEAR COMRADES!!!!

Meany Master say them with her radar eyes and promptly informed them that they were no longer Patriots and were to be gone by the next morning.

The Patriots, knowing they had broken the Rules, were resigned to the fact they must go home, but to be removed from Patriot Squad!! Why, that was not part of the deal!!!!

When speaking to the victims, Meany Master is rumored to have said, "Give me your uniforms and don't bother to remove the letters; I'll mail 'em to yer, yer little jerks."

"Oh, but Meany Master" (Meany Master was now Double Meany Master), Lechar pleaded, "Why must we be removed from the squad?"

"We'll talk about it," was the traditional reply.

But the talk never came about and at State Rally time, a substitute was sent to replace the lost Patriots, Lechar, Nalo, and Atina.

Moral: No, I don't think I will tell you the moral. It is so obvious there is no reason but I will say this: "The poison pen, or pencil as the case may be, of SY strikes again!"